1  MCGREGOR W. SCOTT
   United States Attorney
2  KEVIN C. KHASIGIAN
   ANDRE M. ESPINOSA
3  Assistant U. S. Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA  95814
   Telephone:  (916) 554-2700
5
   Attorneys for the United States
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,

12          Plaintiff,

13      v.                                    *AMENDED* VERIFIED COMPLAINT FOR
                                              FORFEITURE *IN REM*
14 REAL PROPERTY LOCATED AT 725 MAIN
   STREET, MARTINEZ,  CALIFORNIA,
15 CONTRA COSTA COUNTY, APN: 373-192-
   007-4, INCLUDING ALL APPURTENANCES
16 AND IMPROVEMENTS THERETO,

17 REAL PROPERTY LOCATED AT 820 SHELL
   AVENUE, MARTINEZ, CALIFORNIA
18 CONTRA COSTA COUNTY, APN: 375-100-26,
   INCLUDING ALL APPURTENANCES AND
19 IMPROVEMENTS THERETO,

20 REAL PROPERTY LOCATED AT 31
   MORELLO HEIGHTS DRIVE, MARTINEZ,
21 CALIFORNIA CONTRA COSTA COUNTY,
   APN: 377-183-007-6, INCLUDING ALL
22 APPURTENANCES AND IMPROVEMENTS
   THERETO,
23
   REAL PROPERTY LOCATED AT 28
24 MILLTHWAIT DRIVE, MARTINEZ,
   CALIFORNIA CONTRA COSTA COUNTY,
25 APN: 367-121-002-3, INCLUDING ALL
   APPURTENANCES AND IMPROVEMENTS
26 THERETO,

27 ///

28
                                   1

1  REAL PROPERTY LOCATED AT 1208
ROSEANN DRIVE, MARTINEZ,
2  CALIFORNIA CONTRA COSTA COUNTY,
APN: 162-375-007-0, INCLUDING ALL
3  APPURTENANCES AND IMPROVEMENTS
THERETO,
4

5  REAL PROPERTY LOCATED AT 202
VALLEY VIEW PLACE, EL SOBRANTE,
6  CALIFORNIA, CONTRA COSTA COUNTY,
APN: 433-200-031-6, INCLUDING ALL
7  APPURTENANCES AND IMPROVEMENTS
THERETO,

8  REAL PROPERTY LOCATED AT 207
VALLEY VIEW PLACE, EL SOBRANTE,
9  CALIFORNIA, CONTRA COSTA COUNTY,
APN: 433-200-028, INCLUDING ALL
10  APPURTENANCES AND IMPROVEMENTS
THERETO,
11

12  REAL PROPERTY LOCATED AT 208
VALLEY VIEW PLACE, EL SOBRANTE,
13  CALIFORNIA, CONTRA COSTA COUNTY,
APN: 433-200-030-8, INCLUDING ALL
14  APPURTENANCES AND IMPROVEMENTS
THERETO,

15  REAL PROPERTY LOCATED AT 214
VALLEY VIEW PLACE, EL SOBRANTE,
16  CALIFORNIA, CONTRA COSTA COUNTY,
APN: 433-200-029-0, INCLUDING ALL
17  APPURTENANCES AND IMPROVEMENTS
THERETO,
18

19  REAL PROPERTY LOCATED AT 30 PEBBLE
DUNES COURT, LAS VEGAS, NEVADA,
20  CLARK COUNTY, APN: 191-06-214-002,
INCLUDING ALL APPURTENANCES AND
IMPROVEMENTS THERETO,
21

22  REAL PROPERTY LOCATED AT 3143 OLD
TUNNEL ROAD, LAFAYETTE, CALIFORNIA,
23  CONTRA COSTA COUNTY, APN: 185-062-
033-5, INCLUDING ALL APPURTENANCES
AND IMPROVEMENTS THERETO,
24

25  REAL PROPERTY LOCATED AT 1108
JUNIPER AVENUE, SOUTH LAKE TAHOE,
26  CALIFORNIA, EL DORADO COUNTY, APN:
027-222-10-100, INCLUDING ALL
APPURTENANCES AND IMPROVEMENTS
27  THERETO,

28

2

REAL PROPERTY LOCATED AT 40 IRIS LANE, WALNUT CREEK, CALIFORNIA, CONTRA COSTA COUNTY, APN: 185-360-016-9, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 4800 BLUM ROAD, APT. 3, MARTINEZ, CALIFORNIA CONTRA COSTA COUNTY, APN: 159-400-003, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 4810 BLUM ROAD, APT. 5, MARTINEZ, CALIFORNIA CONTRA COSTA COUNTY, APN: 159-400-012-5, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 811 BROWN STREET, MARTINEZ, CALIFORNIA CONTRA COSTA COUNTY, APN: 372-261-006-4, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 2375 YALE STREET, MARTINEZ, CALIFORNIA CONTRA COSTA COUNTY, APN: 376-032-007-1, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 250 ARANA DRIVE, MARTINEZ, CALIFORNIA CONTRA COSTA COUNTY, APN: 162-341-021-2, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 3779 OVERLOOK COURT, SOUTH LAKE TAHOE, CALIFORNIA, EL DORADO COUNTY, APN: 028-123-18-100, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 4101 LAKE TAHOE BLVD, UNIT 217, SOUTH LAKE TAHOE, CALIFORNIA, EL DORADO COUNTY, APN: 029-660-005-000, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 4101 LAKE TAHOE BLVD, UNIT 225, SOUTH LAKE TAHOE, CALIFORNIA, EL DORADO COUNTY, APN: 029-660-011-000,

INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 7373 E. CLUBHOUSE DRIVE, UNIT 14, SCOTTSDALE, ARIZONA, MARICOPA COUNTY, APN: 216-33-865, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 1619 GREENSIDE DRIVE, ROUND ROCK, TEXAS, WILLIAMSON COUNTY, PARCEL NUMBER: R487087, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

REAL PROPERTY LOCATED AT 140 MASON CIRCLE, CONCORD, CALIFORNIA, CONTRA COSTA COUNTY, APN: 159-070-031-4, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO, and

REAL PROPERTY LOCATED AT 4901 PARK ROAD, BENICIA, CALIFORNIA, SOLANO COUNTY, APNs: 0080-060-360-01 AND 0080-060-400-01, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,

Defendants.

The United States of America, by and through its undersigned attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

## NATURE OF ACTION

1.      This is a civil action *in rem*, brought by the United States for forfeiture of real property connected to fraud and money laundering crimes.  The United States also seeks to forfeit six California Limited Liability Companies ("LLCs") that facilitated the acquisition of the defendant properties using proceeds of crime.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345 and over an action for forfeiture under Title 28, United States

1  Code, Section 1355(a).

2       3.     This district is a proper venue pursuant to Title 28, United States Code, Section 1355,

3  because the acts giving rise to this *in rem* forfeiture action occurred in this district, many of the

4  defendant properties are located in this district, and the California Limited Liability Companies

5  ("LLC's") holding title to the defendant properties have their principal business location in this district.

6  <u>**FACTUAL ALLEGATIONS**</u>

7       4.     The defendants in this action are:

8       a.     Real property at 725 Main Street, Martinez, California, Contra
9  Costa County, APN: 373-192-007-4, including all appurtenances
   and improvements thereto, and more fully described in Exhibit A
10 attached hereto and incorporated herein by reference;

11      b.     Real property at 820 Shell Avenue, Martinez, California, Contra
   Costa County, APN: 375-100-026, including all appurtenances and
12 improvements thereto, and more fully described in Exhibit B
   attached hereto and incorporated herein by reference;

13      c.     Real property at 31 Morello Heights Drive, Martinez, California,
14 Contra Costa County, APN: 377-183-007, including all
   appurtenances and improvements thereto, and more fully described
15 in Exhibit C attached hereto and incorporated herein by reference;

16      d.     Real property at 28 Millthwait Drive, Martinez, California, Contra
   Costa County, APN: 367-121-002, including all appurtenances and
17 improvements thereto, and more fully described in Exhibit D
   attached hereto and incorporated herein by reference;

18      e.     Real property at 1208 Roseann Drive, Martinez, California, Contra
19 Costa County, APN: 162-375-007-0, including all appurtenances
   and improvements thereto, and more fully described in Exhibit E
20 attached hereto and incorporated herein by reference;

21      f.     Real property at 202 Valley View Place, El Sobrante, California,
   Contra Costa County, APN: 433-200-031, including all
22 appurtenances and improvements thereto, and more fully described
   in Exhibit F attached hereto and incorporated herein by reference;

23      g.     Real property at 207 Valley View Place, El Sobrante, California,
24 Contra Costa County, APN: 433-200-028, including all
   appurtenances and improvements thereto, and more fully described
25 in Exhibit G attached hereto and incorporated herein by reference;

26      h.     Real property at 208 Valley View Place, El Sobrante, California,
   Contra Costa County, APN: 433-200-030, including all
27 appurtenances and improvements thereto, and more fully described
   in Exhibit H attached hereto and incorporated herein by reference;

28

i.      Real property at 214 Valley View Place, El Sobrante, California, Contra Costa County, APN: 433-200-029, including all appurtenances and improvements thereto, and more fully described in Exhibit I attached hereto and incorporated herein by reference;

j.      Real property at 30 Pebble Dunes Court, Las Vegas, Nevada, Clark County, APN: 191-06-214-002, including all appurtenances and improvements thereto, and more fully described in Exhibit J attached hereto and incorporated herein by reference;

k.      Real property at 3143 Old Tunnel Road, Lafayette, California, Contra Costa County, APN: 185-062-033-5, including all appurtenances and improvements thereto, and more fully described in Exhibit K attached hereto and incorporated herein by reference;

l.      Real property at 1108 Juniper Avenue, South Lake Tahoe, California, El Dorado County, APN: 027-222-010-000, including all appurtenances and improvements thereto, and more fully described in Exhibit L attached hereto and incorporated herein by reference;

m.      Real property at 40 Iris Lane, Walnut Creek, California, Contra Costa County, APN: 185-360-016-9, including all appurtenances and improvements thereto, and more fully described in Exhibit M attached hereto and incorporated herein by reference;

n.      Real property at 4800 Blum Road, Unit 3, Martinez, California, Contra Costa County, APN: 159-400-003-4, including all appurtenances and improvements thereto, and more fully described in Exhibit N attached hereto and incorporated herein by reference;

o.      Real property at 4810 Blum Road, Unit 5, Martinez, California, Contra Costa County, APN: 159-400-012-5, including all appurtenances and improvements thereto, and more fully described in Exhibit O attached hereto and incorporated herein by reference;

p.      Real property at 811 Brown Street, Martinez, California, Contra Costa County, APNs: 372-261-006 and 372-261-006-4, including all appurtenances and improvements thereto, and more fully described in Exhibit P attached hereto and incorporated herein by reference;

q.      Real property at 2375 Yale Street, Martinez, California, Contra Costa County, APN: 376-032-007-1, including all appurtenances and improvements thereto, and more fully described in Exhibit Q attached hereto and incorporated herein by reference;

r.      Real property at 250 Arana Drive, Martinez, California, Contra Costa County, APN: 162-340-021, including all appurtenances and improvements thereto, and more fully described in Exhibit R attached hereto and incorporated herein by reference;

s.      Real property at 3779 Overlook Court, South Lake Tahoe, California, El Dorado County, APN: 028-123-018-000, including

6

1    all appurtenances and improvements thereto, and more fully
2    described in Exhibit S attached hereto and incorporated herein by
     reference;

3    t.    Real property at 4101 Lake Tahoe Blvd, Unit 217, South Lake
           Tahoe, California, El Dorado County, APN: 029-660-005-000,
4          including all appurtenances and improvements thereto, and more
           fully described in Exhibit T attached hereto and incorporated
5          herein by reference;

6    u.    Real property at 4101 Lake Tahoe Blvd, Unit 225, South Lake
           Tahoe, California, El Dorado County, APN: 029-660-011-000,
7          including all appurtenances and improvements thereto, and more
           fully described in Exhibit U attached hereto and incorporated
8          herein by reference;

9    v.    Real property at 7373 E. Clubhouse Drive, Unit 14, Scottsdale,
           Arizona, Maricopa County, APN: 216-33-865, including all
10         appurtenances and improvements thereto, and more fully described
           in Exhibit V attached hereto and incorporated herein by reference;
11

12   w.    Real property at 1619 Greenside Drive, Round Rock, Texas,
           Williamson County, Parcel Number: R487087, including all
13         appurtenances and improvements thereto, and more fully described
           in Exhibit W attached hereto and incorporated herein by reference;

14   x.    Real property at 140 Mason Circle, Concord, California, Contra
           Costa County, APN: 159-070-031-4, including all appurtenances
15         and improvements thereto, and more fully described in Exhibit X
           attached hereto and incorporated herein by reference; and
16

17   y.    Real property at 4901 Park Road, Benicia, California, Solano
           County, APNs: 0080-060-360-01 and 0080-060-400-01, including
18         all appurtenances and improvements thereto, and more fully
           described in Exhibit Y attached hereto and incorporated herein by
19         reference (Hereafter "defendant properties").

20        5.    The record owner of the defendant properties (a) – (k) is Dora Dog Properties, LLC, the

21   defendant properties (l) – (r) is Dog Blue Properties, LLC,  the defendant properties (s) – (w) is Brandy

22   Boy Properties, LLC, the defendant property (x) is 140 Mason Circle, LLC and the defendant property

23   (y) is Park Road, LLC, companies formed and owned by Persons A and B.

24                                          **OVERVIEW**

25        6.    This action is brought by the United States of America pursuant to Title 18, United States

26   Code, Sections 981(a)(1)(A) and (C), seeking the forfeiture of real property involved in, and traceable

27   to, an investment fraud and money laundering scheme by the Company ( "the Company"), a solar

28   equipment company with its principal place of business in the Eastern District of California.  The

7

Company primarily operated through Company S, which raised capital to manufacture and sell solar equipment to tax equity investors, and Company D, which leased the solar equipment from the tax equity investment funds affiliated with Company S.[1]  The Company represented to investors that investing in the solar equipment—i.e., purchasing it through the tax equity investment fund—had very favorable tax consequences, including valuable tax credits and depreciation.

7.      Company S would solicit one or more investors to participate in transactions organized around the manufacture and deployment in the market of mobile solar generator units ("MSGs").  Those transactions triggered favorable tax consequences for the investor, and could be structured to suit the investment appetite of the investor.  For example, in a transaction structured around $100 million in purported value, Company S would solicit an investor to contribute $30 million in cash into an investment fund account.  To cover the balance of the purported value of the transaction, the investor would execute a promissory note to Company S for the remaining $70 million.  The investor held title to the equipment and was obligated to pay debt installments to Company S, pursuant to the note.  However, as part of the transaction, the investment fund leased the MSGs to Company D, which agreed to sublease the MSGs to Telecom Company A and other companies, generating substantial cash flow, which Company D agreed to use to pay down the investment fund's debt obligations (*to Company S*) and other expenses.

8.      The leases and subleases relied upon by investors to claim the promised favorable tax treatment (and other investor benefits as described above) did not exist as described by the Company.  Instead of subleasing the equipment as represented to investors, Company D subleased the units of equipment to Company S, which did not lease the units to end-users.  Rather, Company S raised money from new tax equity investors and transferred it to Company D so that Company D could avoid breaching its lease with the existing tax equity funds.  This arrangement, often referred to as the Master Lease Agreement by company insiders, made the Company appear successful, and the leases appear legitimate, when, in reality, leasing the equipment generated little income and early investors were paid from funds contributed by later investors.  As one former accounting employee at the Company told law

---

[1] Companies S and D are referred to as "the Company," but referred to individually in the context of particular business dealings with investors and others.

enforcement, Company D claimed $55 million in revenue in 2016, but $50 million of Company D's revenue were wire transfers from Company S. The accounting employee stated that Company D did not make very much money from lease revenue. Other employees, including executive-level employees at the Company, have confirmed to law enforcement agents that Company D's lease revenue was minimal and therefore new investor money from Company S was used to pay old investors who had leases with Company D.

9. The Company did not disclose this Ponzi-arrangement to tax equity investors. Nor did the Company disclose to investors the consequences of their misrepresentations and material omissions, including disqualifying the investors from the favorable tax treatment promised to them in exchange for their investment.

## *IN REM* DEFENDANTS

10. The defendant properties were purchased using money from the fraud scheme. The listed owners of the defendant properties are one of several California LLCs created by Individuals 1 and 2, the principals of the Company. In many instances, Individuals 1 and 2 transferred the funds directly from the Company's bank accounts into an escrow account for a desired property. In other instances, Individuals 1 and 2 transferred the funds from the Company to an intermediary account (*e.g.*, the bank account for the LLC or personal accounts held by Individuals 1 and 2), then from that account to an escrow account for the desired property. In total, Individuals 1 and 2 transferred tens of millions of dollars in fraud proceeds to acquire the defendant properties.

11. As discussed below, the California LLCs subject to forfeiture are Dora Dog Properties, LLC, Dog Blue Properties, LLC, Brandy Boy Properties, LLC, 475 Channel Road, LLC, Park Road, LLC and 140 Mason Circle, LLC. The LLCs collectively own the properties subject to forfeiture.

12. Dora Dog Properties, LLC ("Dora Dog"), co-managed by Individuals 1 and 2, was created in 2013 and lists a business address in Benicia, California, in the Eastern District of California. Using funds traced back to the fraud, Dora Dog has acquired eleven properties, five in Martinez, California, four in El Sobrante, California, and one each in Las Vegas, Nevada, and Lafayette, California. Those specific properties are:

*Amended* Verified Complaint
for Forfeiture *In Rem*

    a.  820 Shell Avenue, Martinez, California 94553;
    b.  725 Main Street, Martinez, California 94553;
    c.  31 Morello Heights Drive, Martinez, California 94553;
    d.  28 Millthwait Drive, Martinez, California  94553;
    e.  1208 Roseann Drive, Martinez, California  94533;
    f.  202 Valley View Place, El Sobrante, California, 94803;
    g.  207 Valley View Place, El Sobrante, California, 94803;
    h.  208 Valley View Place, El Sobrante, California, 94803;
    i.  214 Valley View Place, El Sobrante, California, 94803;
    j.  30 Pebble Dunes Court, Las Vegas, Nevada 89141; and
    k.  3143 Old Tunnel Road, Lafayette, California 94549.

13.    Dog Blue Properties, LLC ("Dog Blue"), co-managed by Individuals 1 and 2, was created in 2012 and lists a business address in Benicia, California, in the Eastern District of California.  Using funds traced back to the fraud, Dog Blue has acquired at least eight properties, five in Martinez and one each in Walnut Creek, South Lake Tahoe, and Las Vegas.  Those specific properties are:

    a.  1108 Juniper Avenue, South Lake Tahoe, California 96150;
    b.  40 Iris Lane, Walnut Creek, California 94595;
    c.  4800 Blum Road, Apt 3, Martinez, California 94553;
    d.  4810 Blum Road, Apt 5, Martinez, California 94553;
    e.  811 Brown Street, Martinez, California 94553;
    f.  2375 Yale Street, Martinez, California 94553;
    g.  250 Arana Drive, Martinez, California 94553

14.    Brandy Boy Properties, LLC ("Brandy Boy") was created in 2015 and Individuals 1 and 2 are listed as co-managers.  Brandy Boy also lists a business address in Benicia, California, in the Eastern District of California.  Using funds traced back to the fraud, Brandy Boy has acquired at least five properties, three in South Lake Tahoe and one each in Scottsdale, Arizona, and Round Rock, Texas. Those specific properties are:

    a.  3779 Overlook Court, South Lake Tahoe, California 96150;
    b.  4101 Lake Tahoe Blvd, South Lake Tahoe, CA 96150, Unit 217;
    c.  4102 Lake Tahoe Blvd, South Lake Tahoe, CA 96150, Unit 225;
    d.  7373 E. Clubhouse Drive, #14, Scottsdale, Arizona  85266; and
    e.  1619 Greenside Drive, Round Rock, Texas 78665.

15.    Starting in 2015, Individuals 1 and 2 created a series of entities to hold individual parcels of real estate—named after the address or street of the acquired property.  For example, in 2015 Individuals 1 and 2 created 140 Mason Circle, LLC ("140 Mason Circle"), to acquire property at that

*Amended* Verified Complaint
for Forfeiture *In Rem*

address in Concord, California.  Also in 2015, Individuals 1 and 2 created Park Road LLC ("Park Road") to acquire property at 4901 Park Road in Benicia, California, in the Eastern District of California.  Individuals 1 and 2 used millions in fraud proceeds to purchase properties for 140 Mason Circle and Park Road.

**DECLARATION OF FBI AGENT CHRISTOPHER PHILLIPS**

16.     For a more detailed recitation of facts supporting forfeiture of the defendant properties and describing, in part, the criminal investigation relating to the fraud and money laundering activities of Individuals 1 and 2, and others from 2011 to late 2018, see the Declaration of Special Agent Christopher Phillips In Support of *In Rem* Forfeiture Complaint, dated February 8, 2019, attached hereto and incorporated herein as Attachment 1.

**JUDICIAL FINDINGS OF PROBABLE CAUSE**

17.     On or about December 13, 2018, the Honorable Allison Claire, United States Magistrate Judge for the Eastern District of California, signed four search warrants and over 150 seizure warrants upon a finding of probable cause that Individuals 1 and 2 and others at or associated with the Company have perpetrated and were continuing to perpetrate an investment tax fraud scheme and conspiracy, in violation of Title 18, United States Code, Section 1343 (wire fraud) and Section 371 (conspiracy), and that they have purchased numerous assets, among other transactions, with the proceeds that were derived from the aforementioned wire fraud scheme, in violation of Title 18, United States Code, Section 1957 (money laundering).

18.     On or about December 14, 2018, the Honorable Kandis A. Westmore, United States Magistrate Judge for the Northern District of California, signed one search warrant upon a finding of probable cause that Individuals 1 and 2 and others at or associated with the Company have perpetrated and were continuing to perpetrate an investment tax fraud scheme and conspiracy, in violation of Title 18, United States Code, Section  1343 (wire fraud) and Section 371 (conspiracy), and that they have purchased numerous assets, among other transactions, with the proceeds that were derived from the aforementioned wire fraud scheme, in violation of Title 18, United States Code, Section 1957 (money laundering).

## DECEMBER 18, 2018 SEARCH WARRANT

19.     On December 18, 2018, law enforcement agents executed a federal search warrant at 4901 Park Road in Benicia, California, the business location for the Company.  During the execution of the search warrant, law enforcement found approximately $1.7 million in cash in Individual 1's office safe and over $150,000 in cash in other locations throughout the office suite.  Inside the chief financial executive's office, law enforcement found investor presentation and marketing documents, as well as internal financials for Company D's performance in November 2018 and December 2018.  Furthermore, law enforcement interviewed several employees who provided valuable information concerning the Company's structure and ongoing investment fraud, as discussed below.

## THE JUNE 2015 INVESTOR MATERIALS

20.     The investor presentation found at the Company's headquarters on December 18, 2018, included a pitch deck, marketing materials, and meeting agenda tailored for a large technology company and manufacturer of semiconductor chips.  According to the agenda, a meeting was scheduled for June 2015 and Individuals 1 and 2 were scheduled to attend.  The initial slide announced an Investment Opportunity, followed by detailed slides explaining the Company's corporate structure and background, its financials, the proposed transaction and parties, a deal timeline, examples of successful investor-partners, and three case studies.

21.     The company background portion of the pitch deck focused on the Company's proficiency in manufacturing solar equipment and closing tax equity deals.  The Company represented that it "successfully closed 15 investment funds with headline tax equity investors, including a recent transaction of 619 units" with a value of $93 million, or $150,242.33/unit of equipment.  The Company claimed that in 2015 it had "over 2,300 units deployed" and the capacity to manufacture "900 units per month."

22.     The Company created marketing materials for a potential presentation relating to a $158,239,037 tax equity deal to a tech company, which required $50,083,110 from the tech company. The $158,239,037 would be used to purchase solar equipment from Company S.  Company S would finance approximately $107,650,037 of the proposed deal.  The pitch deck included a diagram of the proposed transaction, with the newly created tax equity fund in the middle and arrows showing the

12

required capital, debt, and flow of money between entities.  Company S and Company D are featured on different sides of the deal with no association, money flow, or sublease arrangement between the entities.  Beneath Company D are the words "Master Lease" with arrows identifying Company D's relationship with end-users; there are no arrows identifying any association between Company D's Master Lease with end-users and Company S, the manufacturer and financer.  Attachment 2 is a diagram of the transaction from the Company's pitch deck.

23.     The proposed deal timeline identifies a 24-week time span for the Company to execute the term sheet, receive the capital, manufacture the units, and deploy them.  Three agreements were required for the deal, the financing agreement, the leases with end-users, and the master lease with Company D.  The deal timeline did not identify a "Master Lease" that would be executed between Company S and Company D.  According to the deal timeline, the Company has capacity to "rollout 900 units per month."

24.     One of the case studies highlights the Company's relationship with Telecom Company A. The Company represents a leasing relationship with Telecom Company A for "100-400 units," charging $1,000 per unit per instance of event, and that Telecom Company A has requested "another 400-600 units."

25.     A second case study highlights the Company's relationship with Company K, a Midwest company specializing in heavy equipment rentals.  The Company represents a five-year equipment lease with Company K, with one five-year option.  As explained below, Company K leased approximately 300 units from one of the Company's investors, paying $900/month/unit, for a total of $270,000/month, but only because Company K entered a backstop sublease agreement with the Company that mirrored the $270,000/month owed from Company K to the investor.  This arrangement made it appear to outsiders that the Company was successful and the leases legitimate.  In reality, as discussed below, Company K rarely leased a unit of the Company's equipment and the Company paid Company K's lease payments to the investor.

## DECEMBER 18, 2018 INTERVIEW OF COMPANY EMPLOYEE 1

26.     During the search of Company A's business headquarters at 4901 Park Road in Benicia, California, law enforcement agents encountered one of Company A's executive officers, Company

13

Employee 1, who agreed to be interviewed.  The interview was audio-recorded by law enforcement.

During the interview, Company Employee 1 described the Company's business model and that historic

lease revenue has been insufficient to cover expenses.  Specifically, Company D cannot generate lease

revenue sufficient to pay the tax equity funds what it owes them pursuant to the lease agreement.  In

order to the funds to make their note payments to Company S, payments were made from Company S to

Company under the "Master Lease Agreement."  Company Employee 1 explained that end-user lease

revenue, i.e., legitimate leases with third parties, had just recently totaled $1 million per month.  Prior to

2016, end-user leases totaled just a couple hundred thousand a month from third parties.

27.     Company Employee 1 told law enforcement that Company S pays between $3 million to

$4 million each month to Company D.  Company Employee 1 described these payments as subsidies to

alleviate Company D's revenue shortfalls.  As explained to him/her by others in the company, the

"Master Lease Agreement" between Company S and Company D "allowed" Company S to subsidize

Company D using new investor funds.  Company Employee 1 said he/she was instructed to do the job

"this way" and that Individual 1 had personally endorsed the "Master Lease Agreement" arrangement.

The use of funds from Company S to Company D to allow the investment funds to make the note

payments to Company S was a question Employee 1 has had since he started working for the Company.

Company Employee 1 has worked for the Company since 2014.

### DECEMBER 18, 2018 INTERVIEW OF COMPANY EMPLOYEE 2

28.     At the business location, law enforcement agents also encountered Company Employee

2, a manager in the operations division of the Company, who agreed to be interviewed.  The interview

was audio-recorded by law enforcement.  Company Employee 2 told law enforcement he/she had been

an employee for approximately six years.  Company Employee 2 was familiar with Telecom Company

A, a national telecommunications company and a large customer of the Company.  Company Employee

2 told law enforcement that the contract with Telecom Company A had expired, but that the actual

amount of lease revenue paid by Telecom Company A was a few hundred thousand dollars a year.

Specifically, in 2018, Telecom Company A generated about $500,000 in total revenue for the Company.

In 2017, Telecom Company A generated about $350,000 to $400,000 in total revenue for the Company.

14

## DECEMBER 21, 2018 INTERVIEW OF INVESTOR 1

29.     On December 21, 2018, law enforcement agents interviewed a representative of Investor 1, a large insurance company that had invested approximately $300 million in the Company's tax equity deals.  This individual was involved in deals between Investor 1 and the Company and spoke directly with Individual 1 concerning one of the deals.  He/She told law enforcement the Company represented to Investor 1 that the major companies subleased the equipment from Company D and those funds would be used to repay the promissory note.  Leasing to major companies absolutely mattered to Investor 1, who would not have invested if the sub-lessees were small companies.

30.     He/She further explained that if there was no lease revenue, Investor 1 would not have invested in Company A's tax equity deals.  The base investment decision required a real transaction in which units were built and placed in service.  The units had to be leased to customers, not sitting in a lot somewhere.  The Company provided Investor 1 with financial projections and other documents representing their existing leases with large businesses.

## THE COMPANY'S DEAL WITH COMPANY K

31.     As explained above, the Company appears to have promoted its purported relationship with Company K in marketing materials concerning a $158,239,037 tax equity deal.  In January 2019, law enforcement agents interviewed Company K's executives concerning their relationship with the Company.

32.     Law enforcement first interviewed an executive with Company K ("Company Executive 1") who explained that Company K entered into a lease agreement with SE Fund IX to lease 300 MSGs. Company K Executive 1 told law enforcement that they—Company K—entered the lease agreement with SE Fund IX only after the Company and Individual 1 promised to sublease the same equipment and pay the full lease amount that Company K owed to SE Fund IX.  Under the terms of the lease between Company K and SE Fund IX, Company K would pay $270,000/monthly or $900/unit for 300 units each month for ten years.  Company K Executive 1 explained that Company K's agreement with the Company was supposed to mirror the terms between of the lease between Company K and SE Fund IX. Company K Executive 1 provided the above lease agreements to law enforcement.  Bank records confirm $270,000 wire transfers from the Company to Company K, and transfers of $270,000 from

Company K to SE Fund IX.

33.     Law enforcement interviewed a second executive with Company K ("Company K Executive 2") who personally negotiated the lease deals with SE Fund IX and the Company.  Company K Executive 2 said that Individual 1 represented to him/her that the Company would fund the entire project by sending full payment from the Company to Company K, which would then send payments to SE Fund IX.  Company K could split any additional leasing profits with the Company.  Company K Executive 2 described the agreement as a consignment and that the Company paid SE Fund IX through Company K.  This executive explained that leasing activity was minimal for the approximately 300 units of equipment delivered to Company K pursuant to the lease.  Company K Executive 2 stated that approximately 10-15% of the 300 MSGs that Company K took possession of had ever been rented.  Individual 1 told Company K Executive 2 that the solar tax credits worked as a pass-through and this arrangement met IRS rules.

## THE OHIO LAWSUIT INVOLVING SE FUND IX AND COMPANY K

34.     In August 2018, SE Fund IX, through its attorneys, filed a lawsuit against Company K for breach of contract and demanded the full amount owed on the lease agreement, totaling over $4.4 million.  SE Fund IX claimed that Company K owed them $270,000 monthly, had not paid the rent for several months, and therefore breached the agreement and owed them the full amount owed on the lease.  SE Fund IX further claimed a breach of the personal guaranty extended by Company K's owner to guarantee the lease agreement between SE Fund IX and Company K.

35.     Company K and its owner responded to the lawsuit in November 2018, denying the allegations and stating that its lease with the fund was only based on the parallel lease between Company K and the Company.  Company K further alleged in a counterclaim that the fund had conspired with the Company to misrepresent "certain relationships and Federal programs, including the use of creat[ing] fictitious documents, proposals and leases, to trap" Company K "into a scheme designed to hold them responsible for monies and false statements" that the funds and the Company "created, promoted and used in order to acquire substantial tax credit sales totaling more than Thirty-Five Million Dollars from the United States Federal Government."  Company K alleged that the fund knew of the Company's efforts to defraud the United States Government.

16

**INDIVIDUAL 2'S $5 MILLION TRANSFER THE DAY
AFTER THE DECEMBER 18, 2018 SEARCH WARRANTS**

36.     As discussed above, law enforcement executed search warrants on December 18, 2018 at the Company's business and the residence of the Company's principals.  Over fifty federal seizure warrants were executed on the Company's bank accounts, the bank accounts of the California LLC's, and other bank accounts connected to the Company.

37.     On December 19, 2018, one day after the execution of federal search and seizure warrants, Individual 2 transferred approximately $5 million directly from a tax investment fund account to an unrelated bank account in South Carolina.  This account related to a newly-formed tax investment fund and was therefore unknown to the investigation.  A new investor had deposited approximately $13 million into the account the day before the execution of warrants, on December 17, 2018.

**TRACING THE PROPERTIES**

38.     As explained above, the properties purchased by the California LLC's are traceable to fraud and money laundering crimes.  For example, in 2015 Individuals 1 and 2 transferred approximately $3.5 million directly from Company S's bank account to purchase the property at 4901 Park Road in Benicia, California.  Bank records show these funds are traceable to the tax equity fraud, specifically, a tax equity investment fund known as SE Fund XVIII.  In another example, Individuals 1 and 2 transferred approximately $1.65 million directly from Company S's bank account to purchase property located at 140 Mason Circle in Concord, California.  Like the above example, the 140 Mason Circle funds can be traced back to the fraud.

39.     Below is a description of each Dora Dog property and the corresponding tracing of financial transactions.

a.  820 Shell Avenue in Martinez, California – purchased using money from the tax equity fund known as SE Fund XVIII.  Money from the fund was transferred to Dora Dog's bank account in 2015 and then used to purchase the property, first via a $10,000 transfer, then a second transfer of $505,950.80.  In total, bank records show $515,950.80 was transferred from Dora Dog's bank account to complete the purchase.

b.  725 Main Street in Martinez, California - purchased using money from the tax equity fund known as SE Fund III, which were transferred from the fund's account to Dora Dog's bank account in 2014.  In total, bank records show $224,292.62 was transferred from Dora Dog's bank account to complete the purchase

17

c. 31 Morello Heights Drive in Martinez, California -- purchased using money from the tax equity fund known as SE Fund XXIX, which were transferred from the fund to Dora Dog's bank account. This money was then used to purchase the property, first via a $10,000 transfer from Dora Dog's bank account, then a second transfer of $522,598.07. In total, bank records show $532,598.07 was transferred from Dora Dog's bank account to complete the purchase.

d. 28 Millthwait Drive in Martinez, California – purchased using money from the tax equity funds known as SE Fund XVIII and XXXII. The funds were transferred to Dora Dog's bank account and then used to purchase the property. In total, bank records show $676,964.30 was transferred from Dora Dog's bank account to complete the purchase.

e. 1208 Roseann Drive in Martinez, California – purchased using money from the tax equity fund known as SE Fund IX. The funds were transferred to Dora Dog's bank account and then used to purchase the property. In total, bank records show $436,399.00 was transferred from Dora Dog's bank account to complete the purchase.

f. 202, 207, 208, and 214 Valley View Place in El Sobrante, California – purchased using money from the tax equity fund known as SE Fund VIII. The funds were transferred to Dora Dog's account and then used to purchase the properties. In total, bank records show over $600,000 was transferred from Dora Dog's bank account to complete the purchases.

g. 30 Pebble Dunes Court in Las Vegas, Nevada – purchased using money from the tax equity fund known as SE Fund XXIII. The funds were transferred to Dora Dog's account in or about 2016 and then used to purchase the properties. In total, bank records show over $2.5 million was transferred from Dora Dog's bank account to complete the purchase.

h. 3143 Old Tunnel Road in Lafayette, California – purchased using money deposited into the Dora Dog account, which has been traced by law enforcement and determined to primarily contained money from tax equity funds and rental proceeds generated from criminally-derived properties. In total, bank records show over $1 million was transferred from Dora Dog's bank account to complete the purchase.

40. Below is a description of each Dog Blue property and the corresponding tracing of financial transactions.

a. 4800 Blum Road, Apt 3, and 4810 Blum Road, Apt 5, in Martinez, California - purchased using money from the tax equity funds known as SE Fund X and XVI. The funds were transferred to Dog Blue's bank account and then used to purchase the properties. In total, bank records show over $250,000 was transferred from Dora Dog's bank account to complete the purchase.

b. 811 Brown Street in Martinez, California – purchased using money from the tax equity funds known as SE Fund XXIII and XXIX. The funds were transferred to Dog Blue's bank account and then used to purchase the properties. In total, bank records show over $3.5 million was transferred from Dora Dog's bank account to complete the purchase.

18

c. <u>2375 Yale Street in Martinez, California</u> – purchased using money from the tax equity fund known as SE Fund XXX, pursuant to a refinance of a separate property purchased with cash.  In total, bank records show over $300,000 was transferred from Dora Dog's bank account to complete the purchase.

d. <u>250 Arana Drive in Martinez, California</u>  – purchased using money from the tax equity fund known as SE Fund XXIX. The funds were transferred to Dog Blue's bank account and then used to purchase the properties.  In total, bank records show nearly $700,000 was transferred from Dora Dog's bank account to complete the purchase.

e. <u>40 Iris Lane in Walnut Creek, California</u> - purchased using commingled money from several tax equity funds. The funds were deposited in Dog Blue's bank account and then used to purchase the property.  In total, bank records show over $800,000 was transferred from Dora Dog's bank account to complete the purchase.

f. <u>1108 Juniper Avenue in South Lake Tahoe, California</u> - purchased using money from the tax equity fund known as SE Fund IV and VIII. The funds were transferred to Dog Blue's bank account and then used to purchase the property.  In total, bank records show over $360,000 was transferred from Dora Dog's bank account to complete the purchase.

41.     Below is a description of each Brandy Boy property and the corresponding tracing of financial transactions:

a. <u>3779 Overlook Court in South Lake Tahoe, California 96150</u> – purchased using money from the tax equity fund known as SE Fund XVIII. The funds were transferred to Brandy Boy's bank account and then used to purchase the property.  In total, bank records show over $1.3 million was transferred from Brandy Boy's account to complete the purchase.

b. <u>4101 Lake Tahoe Blvd, South Lake Tahoe, CA 96150, Unit 217, and 4102 Lake Tahoe Blvd, South Lake Tahoe, CA 96150, Unit 225</u> – purchased using money from the tax equity fund known as SE Fund XXIX. The funds were transferred to Dog Blue's commingled bank account and then used to purchase the properties.  In total, bank records show over $3.5 million was transferred from Brandy Boy's bank account to complete the purchase.

c. <u>7373 E. Clubhouse Drive, #14 in Scottsdale, Arizona</u> – purchased using money from the tax equity funds known as SE Fund XXIX and SE Fund XXIII. The funds were transferred to Dog Blue's commingled bank account and then used to purchase the property.  In total, bank records show over $1 million was transferred from Brandy Boy's bank account to complete the purchase.

d. <u>1619 Greenside Drive in Round Rock, Texas</u> – purchased using money from the tax equity fund known as SE Fund XXIX. The funds were transferred to Dog Blue's commingled bank account and then used to purchase the properties.  In total, bank records show over $280,000 was transferred from Brandy Boy's account to complete the purchase.

19

**FIRST CLAIM FOR RELIEF**
**(18 U.S.C. § 981(a)(1)(C))**

42.     Paragraphs One through Forty-One above are incorporated by reference as though fully set forth herein.

43.     The United States alleges that the defendant properties were derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), which incorporates the definition of "specified unlawful activity" found in 18 U.S.C. § 1961(1), and is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  Wire fraud, a violation of 18 U.S.C. § 1343 constitutes "specified unlawful activity" as defined in § 1961(1).

44.     The United States further alleges in support of it First Claim that there existed a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or the concealment of material facts; and the statements made or facts omitted as part of the scheme were material; there was an intent to defraud; and wire communications were used to carry out or attempt to carry out an essential part of the scheme..

45.     By reason of the above, the defendant properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(A)**

46.     Paragraphs One through Forty-One above are incorporated by reference as though fully set forth herein.

47.     The United States alleges that the defendant properties and defendant entities are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they were involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957.  Specifically, certain individuals knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity.  Wire fraud, a violation of 18 U.S.C. § 1343, and money laundering, a violation of 18 U.S.C. §1957, constitute "specified unlawful activity" as defined in § 1961(1).

48.     By reason of the above, the defendant properties are subject to forfeiture pursuant to Title

18, United States Code, Section 981(a)(1)(A).

49.     The United States does not request authority from the Court to seize the defendant properties at this time.  The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

     a.     post notice of this action and the Complaint on the defendant properties,

     b.     serve notice of this action on the owner of the defendant properties owner along with a copy of this Complaint; and

     c.     file with the county where the properties are located a lis pendens providing notice of the property's status as a defendant in this in rem forfeiture action.

50.     Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the defendant properties, it is not necessary for the Court to issue an arrest warrant *in rem*, or to take any other action to establish *in rem* jurisdiction over the defendant properties.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that:

1. Process issue according to the procedures of this Court in causes of action *in rem*;

2. Any person having an interest in said defendant properties be given notice to file a claim and to answer the complaint;

3. The Court enter a judgment of forfeiture of said defendant properties to the United States; and

4. The Court grant such other relief as may be proper.

Dated:   2/8/2019                                        McGREGOR W. SCOTT
                                                         United States Attorney

                                         By:     /s/ Andre M. Espinosa
                                                  /s/ Kevin C. Khasigian
                                                 ANDRE M. ESPINOSA
                                                 KEVIN C. KHASIGIAN
                                                 Assistant U.S. Attorneys

**VERIFICATION**

I, Christopher Phillips, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States and information supplied to me by other law enforcement officers, together with others, as a Special Agent with the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/8/19

  /s/ Christopher Phillips
CHRISTOPHER PHILLIPS
Special Agent
Federal Bureau of Investigation

(Signature retained by attorney)

*Amended* Verified Complaint
for Forfeiture *In Rem*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**Real Property Located at 725 Main Street, Martinez, California**

PORTION OF LOTS 6 AND 7, BLOCK 323, ADDITIONAL SURVEY TOWN OF MARTINEZ AS PER MAPS THEREOF ON FILE IN THE OFFICE OF THE RECORDER OF THE COUNTY OF CONTRA COSTA, DESCRIBED AS FOLLOWS:

BEGINNING ON THE NORTHWEST LINE OF MAIN STREET BEGIN THE SOUTHEAST LINE OF SAID BLOCK 323 OF SAID ADDITIONAL SURVEY OF THE TOWN OF MARTINEZ, AT THE MOST EASTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED FROM LUCIEN BAER TO FRANK RATTAN, DATED OCTOBER 10, 1995 AND RECORDED OCTOBER 11, 1905, BOOK 111 OF DEEDS, PAGE 550, THERETO FROM SAID POINT OF BEGINNING NORTHWESTERLY ALONG THE NORTHEAST LINE OF SAID RATTAN'S PARCEL, 100 FEET TO THE MOST NORTHERLY CORNER THEREOF, THENCE NORTHEASTERLY, PARALLEL WITH THE NORTHWEST LINE OF MAIN STREET, 28 FEET; THENCE SOUTHEASTERLY, PARALLEL WITH THE NORTHEAST LINE OF SAID RATTAN PARCEL, 100 FEET TO THE NORTHWEST LINE OF MAIN STREET, THENCE SOUTHWESTERLY ALONG SAID NORTHWEST LINE, 28 FEET TO THE POINT OF BEGINNING.

APN: 373-192-007-4

**EXHIBIT B**

**Real Property Located at 820 Shell Avenue, Martinez, California**

The following described property in the City of Martinez, County of Contra Costa, State of California:

Portion of the Rancho Las Juntas, described as follows:

Beginning on the South line of Shell Avenue, being the South line of the strip of land described in the deed from H. V. Alvarado, et al to Contra Costa County, recorded June 6, 1929, in Volume 161 of Official Records, at Page 473, distance thereon Northeasterly, along the arc of a curve to the right with a radius of 686.25 feet, an arc distance of 60 feet from the most Northerly corner of the tract of land designated on the map entitled "Harbor View Heights, Martinez, Contra Costa County, California", which Map was filed in the Office of the Recorder of the County of Contra Costa, State of California, on August 18, 1952, in Volume 47 of Maps, at Page 42; thence from said point of beginning Southwesterly, along said South line, along the arc of a curve to the left with a radius of 686.25 feet, an arc distance of 60 feet to said most Northerly corner of Harbor View Heights; thence South 30° 19' East, along the East line of said Harbor View Heights, 103.6 feet to the most Easterly corner thereof; thence North 76° 23' 11" East, 51.62 feet to the Southwest corner of the parcel of land described in the deed from William S. Wheeler, et ux, to N. F. Sanderson, et ux, recorded August 25, 1948, in Volume 1258 of Official Records, at Page 271; thence North 8° 11" West, along the West line of said Sanderson parcel (1258 or 271), 70 feet to the North line thereof; thence South 81° 49' West, along the direct extension South 81° 49' West of the West line of said Sanderson parcel (1258 or 271), to a point that bears South 32° 45' East from the point of beginning; thence North 32° 45' West, 63 feet to the point of beginning.

APN:  375-100-026

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**

**31 Morello Heights Drive, Martinez, California**

The land referred to herein below is situated in the City of Martinez, County of Contra Costa, State of California and is described as follows:

Lot 41, Map of Subdivision 3174, filed February 26, 1964, Map Book 97, Page 32, Contra Costa County Records.

APN: 377-183-007

1

**EXHIBIT D**

2

**28 Millthwait Drive, Martinez, California**

3

    The land referred to herein below is situated in the unincorporated area in County of Contra

4

Costa, State of California and is described as follows:

5

    Lot 7, as shown on the map of "Millthwait, Contra Costa County, California", filed March 16,

6

    1953, in Book 49 of Maps, Page 50, in the Office of the County Recorder of Contra Costa
    County.

7

APN: 367-121-002-3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT E**

**1208 Roseann Drive, Martinez, California**

The land described herein is situated in the state of California, County of Contra Costa, City of Martinez, and is described as follows:

Lot 92 and the North 11 feet, front and rear measurements, of lot 93, Map of Subdivision 3579, filed August 9, 1967, Map Book 116, Page 48, Contra Costa County Records.

Excepting Therefrom:
1- Mineral rights reserved in the deed from Vicencia S. Pereira, guardian, recorded May 5, 1965, Book 4861, Official Records, Page 145, and as reserved in the deed from Dominic Pereira, et al, Recorded May 5, 1965, Book 4861, Official Records, Page 148, as follows:

"One-half of all oil, gas casinghead gas, asphaltum and other hydrocarbons and all chemical gas now or hereafter found, situated or located in all or any part or portion of the land above described lying more than five hundred feet (500 feet) below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbons and chemical gas lying below a depth of more than five hundred feet (500 feet) below the surface thereof, and the right to grant leases for all or any of said purposes, but without any right whatsoever to enter upon the surface of said lands within five hundred feet (500 feet) vertical distance below the surface thereof."

APN: 162-375-007-0

**EXHIBIT F**

**202 Valley View Place, El Sobrante, California**

The land referred to is situated in the unincorporated area of the County of Contra Costa, State of California, and is described as follows:

Parcel One:

Lot 5 as shown on the Map of Subdivision 8356 filed September 22, 2006 in Book 495 of Maps, at Page 27 and 28 Contra Costa County Official Records

Reserving therefrom:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, over that portion of Lot 3 shown on said Map as "Valley View Place", to be an appurtenance to the remaining lands of the trustor.

Parcel Two:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, as an appurtenance to Parcel One above, over that portion of Lots 1, 2, 3 and 4 shown on said Map as "Valley View Place".

APN: 433-200-031

**EXHIBIT G**

**207 Valley View Place, El Sobrante, California**

The land referred to is situated in the unincorporated area of the County of Contra Costa, State of California, and is described as follows:

Parcel One:

Lot 2 as shown on the Map of Subdivision 8356 filed September 22, 2006 in Book 495 of Maps, at Page 27 and 28 Contra Costa County Official Records.

Reserving therefrom:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, over that portion of Lot 2 shown on said Map as "Valley View Place", to be an appurtenance to the remaining lands of the trustor.

Parcel Two:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, as an appurtenance to Parcel One above, over that portion of Lots 1 and 3 through 5 shown on said Map as "Valley View Place".

APN: 433-200-028

**EXHIBIT H**

**208 Valley View Place, El Sobrante, California**

The land referred to is situated in the unincorporated area of the County of Contra Costa, State of California, and is described as follows:

Parcel One:

Lot 4 as shown on the Map of Subdivision 8356 filed September 22, 2006 in Book 495 of Maps, at Page 27 and 28 Contra Costa County Official Records

Reserving therefrom:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, over that portion of Lot 3 shown on said Map as "Valley View Place", to be an appurtenance to the remaining lands of the trustor.

Parcel Two:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, as an appurtenance to Parcel One above, over that portion of Lots 1, 2, 3 and 5 shown on said Map as "Valley View Place"

APN: 433-200-030.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT I**

**214 Valley View Place, El Sobrante, California**

The land referred to is situated in the unincorporated area of the County of Contra Costa, State of California, and is described as follows:

Parcel One:

Lot 3 as shown on the Map of Subdivision 8356 filed September 22, 2006 in Book 495 of Maps, at Page 27 and 28 Contra Costa County Official Records

Reserving therefrom:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, over that portion of Lot 3 shown on said Map as "Valley View Place", to be an appurtenant to the remaining lots of Subdivision 8356.

Parcel Two:

A non-exclusive easement for access, utilities, drainage, maintenance, ingress and egress, as an appurtenance to Parcel One above, over that portion of Lots 1, 2, 4 and 5 shown on said Map as "Valley View Place".

APN: 433-200-029

31

**EXHIBIT J**

**30 Pebble Dunes Court, Las Vegas, Nevada**

Parcel I:

Lot Seventy-Three (73) in Lot 319 Unit No. 4 at Southern Highlands, as shown by map thereof on file in Book 117, of Plats, Page 25, in the office of the County Recorder of Clark County, Nevada.

Parcel II:

A Non-exclusive Easement for ingress, egress, and enjoyment in and to the private streets as shown on the map of the map of said plat.

APN: 191-06-214-002

*Amended* Verified Complaint
for Forfeiture *In Rem*

**EXHIBIT K**

**3143 Old Tunnel Road, Lafayette, California**

All the real property in the County of Contra Costa, City of Lafayette, State of California, described as follows:

Portion of Lots 33, 34 and 35, as shown on the Map entitled, "Tract 2387, Contra Costa County, California", filed April 19, 1956 in the Office of the County Recorder of said County in Book 63 of Maps at Page 35, described as follows:

Beginning on the Southeast corner of said Lot 33; thence from said point of beginning North 78° 29' 03" West, along the South line of said Lot 35, 124.9 feet; thence North 11° 30' 57" East 32.5 feet to the Southeast corner of said Lot 34; thence continuing North 11° 30' 57" East, along the East line of said Lot 34, 87.96 feet; thence North 63° 12' West 134.99 feet to the West line of said Lot 35, thence North 30° 06' 27" East, along said West line, 20.03 feet to a point thereon which bears South 30° 06' 27" West, 106.07 feet from the Northwest corner of said Lot 35; thence South 63° 12' East, 128.37 feet to the Southeast corner of said Lot 35; thence North 11° 30' 57" East, along the East line of said Lot 35, 0.63 feet; thence South 88° 42' 05" East 97.89 feet to the East line of said Lot 33; thence South 1° 17' 55" West, along said East line, 161.1 feet to the point of beginning.

APN: 185-062-033-5

1

2

**EXHIBIT L**

**1108 Juniper Avenue, South Lake Tahoe, California**

3

4

    The land referred to is situated in the County of El Dorado, City of South Lake Tahoe, State of California, and is described as follows:

5

    Lots 127 and 147, as said Lots are shown on the Official Map of Bijou Pines, filed September 12, 1959, in the Office of the El Dorado County Recorder, in Map Book A, Page 13.

6

APN: 027-222-010-000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34

1

**EXHIBIT M**

2

**40 Iris Lane, Walnut Creek, California**

3

Parcel 1:

4

Portion of Lot 17, as designated on the Map entitled "Map of Floraland Tract Subdivision"

5

which Map was filed in the office of the Recorder of the County of Contra Costa, State of California, on July 19, 1913 in Volume 10 of Maps, at Page 241, described as follows:

6

Beginning on the West line of the Parcel of land described as Parcel One in the deed from

7

Charles Kaski, et ux, to Elmira May Cox, et al, dated October 18, 1947 and recorded November 28, 1047 in Volume 1151 of Official Records, at Page 311, distant thereon South 1° 38' East, 100

8

feet from the South line of the Parcel of land described as Parcel One in the Deed of Trust made by Charles Kaski, et ux, to Trustee for Robert A. Holmes, et ux, dated May 19, 1948 and

9

recorded June 4, 1948 in Volume 1286 of Official Records, at Page 487; thence from said point of beginning North 1° 38' West, along said West line 100 feet to the Southline to the Parcel of

10

land described in said Deed of Trust; thence North 89° 40' East, along said Southline, 102.5 feet to the East line of said Elmira May Cox Parcel (1151 or 311); thence South 1° 38' East, along

11

said East line, 100 feet to a portion which bears North 89° 40' East from the point of beginning; thence South 89° 40' West, 102.5 feet to the point of beginning.

12

Parcel 2:

13

A right of way (not to be exclusive) as an appurtenance to Parcel one above, for use as a roadway

14

for vehicles of all kinds, pedestrians, and animals, for water, gas, oil and sewer pipe lines, and for telephone, electric light and power lines, together with the necessary poles or conduits to

15

carry said lines over a strip of land 25 feet in width the center line of which is described as follows:

16

Beginning at a 2 inch by 2 inch Hub at the Northwest corner of the Parcel of land described as

17

Parcel One in the deed from Charles Kaski, et ux, to Elmira Way Cox, et al, dated October 18, 1947 and recorded November 28, 1947 in Volume 1161 of Official Records, at Page 311; thence

18

from said point of beginning, along the West line of said Cox Parcel as follows: South 1° 38' East, 224.61 feet; Southerly along the arc of a curve to the left with a radius of 40 feet, tangent to

19

the last mentioned course, 31.31 feet; South 48° 29' East, tangent to said curve, 17.45 feet; Southerly along the arc of a curve to the right with a radius of 50 feet, tangent to the last course,

20

39.14 feet and South 1° 38' East, 126.94 feet to a nail set in the center line of a County Road.

21

Excepting from Parcel Two.

22

That portion thereof lying within Parcel One above.

23

The interest conveyed to County of Contra Costa by deed from Stephen Dawning, et al, dated January 21, 1918 and recorded January 23, 1918 in Volume 315 of Deeds, at Pages 6.

24

APN: 185-360-016-9

25

26

27

28

1

2

3

4

**EXHIBIT N**

**4800 Blum Road, Unit 3, Martinez, California**

The following described property in the unincorporated area of the County of Contra Costa, State of California:

Parcel One:
Unit 3, of Tract 5962 filed July 26, 1980, Map Book 255, Page 5, Contra Costa County Records, as said unit is shown on the condominium plan attached to and made a part of the declaration of restrictions recorded June 23, 1982, Book 10825, Page 151 Contra Costa County Records.

Excepting Therefrom:
Easements through said unit appurtenant to the common area and all other units, for support and repair of the common area and all other units.

Parcel Two:
An undivided 1/13th interest as tenants in common in and to the common area, as said common area is shown on said condominium plan.

Excepting and reserving therefrom:
Non-exclusive easements appurtenant to all other units for support and repair of the said common area and other units and; exclusive easements appurtenant to the other units for use of balconies and garages as shown on said attached condominium plan.

Parcel Three:
Together with the following appurtenant easements:
An exclusive easement to use balcony/balconies appurtenant to said unit as shown on said condominium plan.
An exclusive easement to use garage stall nos. C-3 and C-3 as shown on said condominium plan.
Excepting and reserving therefrom:
Non-exclusive easements herein described as parcel 4.

Parcel Four:
Together with non-exclusive easements through each unit and garage stall for support and repair of the common area and other units.

APN: 159-400-003-4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT O**

**4810 Blum Road, Unit 5, Martinez, California**

      The land referred to is situated in the county of Contra Costa, City of Martinez, State of California, and is described as follows:

A condominium composed of:

Parcel One:
      Unit 12, of Tract 5962, filed July 28, 1980, Map Book 255, Page 5, Contra Costa County Records, as said Unit is shown on the Condominium Plan attached to and made a part of the Declaration of Restrictions recorded June 23, 1982, Book 10825, Page 15, Contra Costa County Records.

      Excepting therefrom: easements through said unit appurtenant to the common area and all other units, for support and repair of the common area and all other units.

Parcel Two:
      An undivided 1/13th interest as tenants in common in and to the Common Area, as said Common Area is shown on said Condominium Plan.

      Excepting and reserving therefrom: Non-exclusive easements appurtenant to all other Units for support and repair of the said Common Area and other Units and; Exclusive easements appurtenant to the other Units for use of Balconies and Garages as shown on said attached Condominium Plan.

Parcel Three:
      Together with the following appurtenant easements: An exclusive easement to use Balcony/Balconies appurtenant to said Unit as shown on said Condominium Plan. An exclusive easement to use Garage Stall Nos. C-12 and C-12, as shown on said Condominium Plan.

      Excepting and reserving therefrom: Non-exclusive easements herein described as Parcel 4.

Parcel Four:
      Together with non-exclusive easements through each Unit and Garage Stall for support and repair of the Common Area and other Units.

APN: 159-400-012-5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT P**

**Real Property Located at 811 Brown Street, Martinez, California**

THE LAND REFERRED TO HEREIN IS SITUATED IN CONTRA COSTA COUNTY, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

.

LOTS 6, 7, 8, BLOCK 192, MAP OF THE ORIGINAL SURVEY TOWN OF MARTINEZ, AS MAPS THEREOF OF FILE IN THE OFFICE OF THE RECORDER OF THE COUNTY OF CONTRA COSTA.

APNs: 372-261-006 and 372-261-006-4

**EXHIBIT Q**

**Real Property Located at 2375 Yale Street, Martinez, California**

The land referred to is situated in the County of Contra Costa, City of Martinez, State of California, and is described as follows:

Portion of the Rancho Las Juntas, described as follows:

Beginning on the extension North 89° 15' West of the North line of Lot 4, as designated on the Map entitled "Lewis Tract Unit No. 1, Contra Costa County, California", which Map was filed in the Office of the County Recorder of the County of Contra Costa, State of California, on December 26, 1939 in Volume 23 of Maps, at Page 737, distant thereon, 90 feet from the North-West corner of said Lot 4, said point of beginning being also the Northeast corner of the Parcel of land described in the Deed from Ray Fitzhugh, et ux, to Henry B. Lewis, et ux, undated and Recorded January 29, 1946 in Book 888 of Official Records, Page 102; thence from said point of beginning North 89° 15' West along the North line of said Lewis parcel (888 OR 102) and along the North line of the parcel of land described in the Deed from George Lytle, et ux, to Henry B. Lewis, et ux, dated March 16, 1945 and Recorded March 29, 1945 in Volume 807 of Official Records at Page 461, 100 feet to the Northwest corner of said Lewis parcel, (807 OR 461); thence South along the West line of said parcel (808 OR 461), 100 feet to the Southeast corner thereof; thence South 89° 15' East along the South line of said Parcel (807 OR 461) and along the South line of said Lewis Parcel (888 OR 102), 100 feet to the Southeast corner of the last mentioned Lewis Parcel (888 OR 102); thence North .along the East line of said Parcel (888 OR 102), 100 feet to the point of beginning.

Excepting therefrom the Northerly 5.00 feet thereof as described as Parcel 3 in Deed from Henry B. Lewis, et ux, et al, to the County of Contra Costa, dated July 23, 1942 and Recorded July 29, 1942 in Book 672 of Official Records, Page 391.

APN: 376-032-007-1

*Amended* Verified Complaint
for Forfeiture *In Rem*

**EXHIBIT R**

**Real Property Located at 250 Arana Drive, Martinez, California**

The land referred to is situated in the County of Contra Costa, City of Martinez, State of California, and is described as follows:

Lot 21, Map of Tract 3228, filed on February 19, 1984, Map Book 97, Page 27, Contra Costa County Records.

APN: 162-341-021.

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT S**

**Real Property Located at 3779 Overlook Court, South Lake Tahoe, California**

The land described herein is situated in the State of California, County of El Dorado, City of South Lake Tahoe, described as follows:

Lot 18 of Heavenly View Terrace, filed in the office of the County Recorder, County of El Dorado, State of California on June 10, 1959 in Book C of Maps at Page 10.

APN: 028-123-018-000

*Amended* Verified Complaint
for Forfeiture *In Rem*

**EXHIBIT T**

**Real Property Located at 4101 Lake Tahoe Blvd, Unit 217, South Lake Tahoe, California**

Real property in the City of South Lake Tahoe, County of El Dorado, State of California, described as follows:

A CONDOMINIUM CONSISTING OF:

Parcel 1:

Unit 217, consisting of certain air space and elements, as described in the Condominium Plan entitled "Amended and Restated Condominium Plan" ("Condominium Plan"), which Condominium Plan recorded January 26, 2017 as Document No. 2017-0003701 of the Official Records of said County, being a portion of Parcel B, as shown on the map entitled "'Zalanta Resort at the Village", filed on September 12, 2016 in Book J of Maps at Page 149 and amended by map entitled "Amended Final Map, Zalanta Resort at the Village, filed on April 12, 2017 in Book K of Maps at Page 5, El Dorado County Records.

EXCEPTING AND RESERVING THEREFROM, nonexclusive easements for access, ingress, egress, encroachment, maintenance, repair, drainage, support, and for other purposes, all as described in the Declaration referred to below.

Parcel 2:

An undivided 1/35th fee simple interest as tenant-in-common in the Building Common Area (the "Building Common Area") shown on the Condominium Plan entitled "Amended and Restated Condominium Plan", which Condominium Plan recorded January 26, 2017 as Document No. 2017-0003701 of the Official Records of said County, EXCEPTING THEREFROM the following: (a) Units 111 through 115, 211 through 214, 217, 219  through 223, 225 through 229, 311 through 314, 317, 319 through 323, 325 through 329, located thereon, (b) all non-exclusive easements for use, enjoyment, access, ingress, egress, encroachment, maintenance, repair, drainage, support and for other purposes, all as described in the Declaration referred to below, and (c) all exclusive rights for use, possession and enjoyment in and to that portion of said Common Area shown and defined as the "Balcony", Exclusive Use Common Areas on said Condominium Plan.

Parcel 3:

Nonexclusive rights appurtenant to Parcel 1 (one) for access, ingress, egress, encroachment, repair, drainage, support, and for other purposes, all as described in the "Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Zalanta Resort at the Village" which recorded on October 26, 2016 as Document No. 2016-0051511 of the Official Records of said County, together with any amendments, modifications, or annexations  thereto, as may occur from time to  time ("Declaration").

Parcel 4:

An exclusive right for use, possession and enjoyment for a balcony appurtenant and adjacent to Parcel 1.

APN: 029-660-005-000

**EXHIBIT U**

**Real Property Located at 4101 Lake Tahoe Blvd, Unit 225, South Lake Tahoe, California**

Real property in the City of South Lake Tahoe, County of El Dorado, State of California, described as follows:

Parcel 1:

Unit 225, consisting of certain air space and elements, as described in the Condominium Plan entitled "Amended and Restated Condominium Plan" ("Condominium Plan"), which Condominium Plan recorded January 26, 2017 as Document No. 2017-0003701 of the Official Records of said County, being a portion of Parcel B, as shown on the map entitled "'Zalanta Resort at the Village", filed on September 12, 2016 in Book J of Maps at Page 149 and amended by map entitled "Amended Final Map, Zalanta Resort at the Village, filed on April 12, 2017 in Book K of Maps at Page 5, El Dorado County Records.

EXCEPTING AND RESERVING THEREFROM, nonexclusive easements for access, ingress, egress, encroachment, maintenance, repair, drainage, support, and for other purposes, all as described in the Declaration referred to below.

Parcel 2:

An undivided 1/35th fee simple interest as tenant-in-common in the Building Common Area (the "Building Common Area") shown on the Condominium Plan entitled "Amended and Restated Condominium Plan", which Condominium Plan recorded January 26, 2017 as Document No. 2017-0003701 of the Official Records of said County, EXCEPTING THEREFROM the following: (a) Units 111 through 115, 211 through 214, 217, 219 through 223, 225 through 229, 311 through 314, 317, 319 through 323, 325 through 329, located thereon, (b) all non-exclusive easements for use, enjoyment, access, ingress, egress, encroachment, maintenance, repair, drainage, support and for other purposes, all as described in the Declaration referred to below, and (c) all exclusive rights for use, possession and enjoyment in and to that portion of said Common Area shown and defined as the "Balcony", Exclusive Use Common Areas on said Condominium Plan.

Parcel 3:

Nonexclusive rights appurtenant to Parcel 1 (one) for access, ingress, egress, encroachment, repair, drainage, support, and for other purposes, all as described in the "Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Zalanta Resort at the Village" which recorded on October 26, 2016 as Document No. 2016-0051511 of the Official Records of said County, together with any amendments, modifications, or annexations thereto, as may occur from time to time ("Declaration").

Parcel 4:

An exclusive right for use, possession and enjoyment for a balcony appurtenant and adjacent to Parcel I (one), which is shown as "EUCA Balcony" on the Condominium Plan, for use as may be permitted in the Declaration.

APN: 029-660-011-000

*Amended* Verified Complaint
for Forfeiture *In Rem*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT V**

**Real Property Located at 7373 E. Clubhouse Drive, Unit 14, Scottsdale, Arizona**

Unit 14, AMENDED AND RESTATED CONDOMINIUM  PLAT OF THE BOULDERS CASITAS, according to Amended and Restated Condominium Declaration recorded in Document No. 2014-287000 and Plat recorded in Book 679 of Maps, Page 18, records of Maricopa County, Arizona and thereafter Affidavit of  Correction recorded in Document No 2004-490359;

TOGETHER WITH an undivided interest in the common elements as set forth in said Declaration and Plat and any Annexations thereto.

APN: 216-33-865

*Amended* Verified Complaint
for Forfeiture *In Rem*

**EXHIBIT W**

**1619 Greenside Drive, Round Rock, Texas**

Lot 23, Block 1, of Teravista Section 15B, a subdivision in Williamson County, Texas, according to the map or plat thereof, recorded in Cabinet DD, Slide 18, Plat Records, Williamson County, Texas.

Parcel Number: R487087

45

**EXHIBIT X**

**140 Mason Circle, Concord, California**

Lot 18, Map of Subdivision 5994, filed January 6, 1982, Map Book 262, Page 8, Contra Costa County Records.

Excepting therefrom: the rights reserved in the deed from Marshall McKean, et ux recorded September 23, 1952, Book 1995 Official Records, Page 593, as follows:

"All oil, gas, casinghead gasoline and other hydrocarbons and mineral substances in, on and under said land, or that may be produced, recovered or saved from said land with the right to enter on said property for the purposes of exploring, taking, removing, disposing, mining and operating for oil, gas and other hydrocarbon and mineral substances and all rights reasonably incident to such purposes."

The rights of entry thereunder were restricted to certain locations by agreement to restrict entry rights, recorded October 16, 1981, Book 10538 Official Records, Page 989, and as re-recorded January 18, 1982, Book 10646 Official Records, Page 85.

Also excepting therefrom:

Mineral rights recorded in book 2032, page 551 of official records and mineral and access rights recorded in book 2165, page 26 of official records.

APN: 159-070-031-4

46

1

2

## EXHIBIT Y

### 4901 Park Road, Benicia, California

3

The following described property in the city of Benicia County of Solano, State of California:

4

New parcel A as shown on exhibit A Sub-parcel 1 (insight) on certificate of compliance lot line adjustment as evidenced by document recorded September 13, 2004 as Instrument No. 2004-128987 of official records being more particularly described as follows:

5

6

Beginning at the most northeasterly corner of parcel 5-1A-1 as shown on the parcel map filed April 18, 1973 in Book 7 of parcel maps at Page 45, Solano County Records, and being the true point of beginning for "new parcel one" as shown on the lot line adjustment filed February 25, 2004 as document no. 200400021070, Solano County Records; thence south 24° 05' 00" east, 369.91 feet to the beginning of a curve concave to the west having a radius of 78 feet; thence southerly along the curve, 76.63 feet through a central angle of 56° 17' 17"; thence south 32° 12' 17" west 462.49 feet; thence north 57° 47' 43" west 591 feet; thence north 32° 12' 17" east 48.67 feet; thence north 39° 44' 26" east 122 feet; thence north 32° 12' 17" east 119.05 feet to the beginning of a curve concave to the southeast having a radius of 493.34 feet; thence northeasterly along the curve 290.27 feet through a central angle of 33° 42' 43"; thence north 65° 55' 00" east 224.62 feet; thence south 24° 05'00" east 30 feet to the point of beginning.

7

8

9

10

11

12

APNs: 0080-060-360-01 and 0080-060-400-01

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28