# ATTACHMENT 1

McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>REAL PROPERTY LOCATED AT 725 MAIN STREET, MARTINEZ,  CALIFORNIA, CONTRA COSTA COUNTY, APN: 373-192-007-4, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO, ET AL.,<br><br>　　　　　Defendants. | CASE NO.<br><br>DECLARATION OF SPECIAL AGENT CHRISTOPHER PHILLIPS IN SUPPORT OF *IN REM* FORFEITURE COMPLAINT |

I, Christopher Phillips, hereby declare under penalty of perjury of the laws of the United States of America that the following is true to the best of my knowledge, information, and belief:

## I.　　**INTRODUCTION**

1.　　As discussed in more detail below, from at least December 2009 through the present, Individual 1 and Individual 2 have owned and operated two closely related business entities, Company S and Company D.  These entities are jointly run by Individuals 1 and 2, who are husband a wife, and I refer to them hereinafter collectively as "the Company," unless otherwise indicated.  Since approximately 2016, the headquarters for the Company has been located at 4901 Park Road, in Benicia, California, in the Eastern District of California.

2.　　The business model of the Company has been and is that it, either directly or through

1

subcontractors, builds or assembles mobile solar generators ("MSGs"), which consist of solar panels that are placed on a wheeled-trailer that includes other features.  Company D was and is the entity that leases the MSGs to third parties, including negotiating the lease agreements with third parties and collecting the lease payments from third parties.  Individual 1 and others affiliated with the Company have touted the versatility and environmental sustainability of MSGs, and have claimed that they are used by cellular telephone providers to provide emergency power to cellular towers in the case of a power failure or to power light standards at sporting events, among other claimed uses.  Individual 1 and others affiliated with the Company also have represented that there is a substantial market demand for MSGs and that Company D has entered into long-term lease agreements with third parties for thousands of units as well as a substantial number of short-term lease agreements.

3.      The Company, through Individual 1 and others acting as his direction, have solicited money from investors with respect to the MSGs.  One of the primary claims that Individual 1 and others acting act his direction or connection with the Company have made to investors is that the purchase of MSGs has very favorable tax consequences.  This includes tax credits available for investment in alternative energy sources within the federal tax code that may permit the purchaser of the MSG to claim a tax credit of up to 30% of the total investment, and also may permit deductions for the depreciation of the MSGs over a 5-year period.  These tax savings are significant.

4.      Additionally, the Company has structured the transactions with investors to maximize the tax benefits to the investors.  In particular, the Company has sold the MSGs to limited liability companies that were created specifically for such transactions.  These companies are investment funds, sometimes called tax-equity funds, that are permitted under the tax code.  Most of the investment funds have been and are managed by a company called SM, Inc., also called SMS, Inc., which I collectively refer to as "SM, Inc." unless otherwise indicated.

5.      Through the investment funds, the investors have purchased the MSGs from Company S for $150,000 per MSG.  However, as part of the deal with the Company, the investors have paid in cash only approximately $45,000 per MSG, which is 30% of the overall price per unit, with the remainder financed by Company S.  The $45,000-per-unit amount is the maximum amount of the tax credit the investors are able to claim per unit.  Essentially, the Company has structured the deals so that the total

amount of money the investors initially pay to Company S per unit can be immediately claimed as a dollar-for-dollar tax credit.  Thereafter, the investors also can claim depreciation with respect to each of the MSGs for a five-year period.

6.      As part of these deals, investors have deposited the funds by wire transfer into bank accounts created for the investment funds.  Individuals 1 and 2, as well as their children, were and are the signatories for many of the bank accounts created for the investment funds, as well as Employee 1, the an executive with the Company.  After the investors' money was deposited into the investment funds' bank accounts, a portion was used for what appears to be fund expenses and the remainder was transferred to a bank account for Company S.

7.      Under the Company's business model, the remaining approximately 70% of the transaction was financed by Company S.  The investment funds provided a promissory note to pay Company S the remainder of the sales price over the course of a certain period of time.  The source of the money to pay off the note held by Company S was to be the revenues generated from the lease of the MSG by Company D to third parties.

8.      Under the business model presented to investors and others, the investment funds lease the MSGs to Company D, which in turn is to lease the MSGs to third parties.  Company D is supposed to receive money from the third parties through lease payments.  After deducting certain fees, Company D is to transfer the majority of the lease revenue to the bank accounts for investment funds.  The manager of the investments funds, typically SM, Inc., is to use the lease revenue sent by Company D to pay down the note held by Company S, with a small remaining share paid to the investors on a monthly basis.

9.      The purported lease revenue from third parties was a critical component of the transaction because the investment funds provided no money other than that initially contributed by the investors that covered only approximately 30% of the transaction.  Without some mechanism for payment of the remaining approximately 70% of the sales transaction, the transaction would facially be a sham.  As such, the existence of lease revenue from third parties to Company D was required in order for the investors to obtain their tax benefits and to entice investors to make the initial investment of $45,000 per MSG.

3

10.     The below chart is a visual depiction of the way the money was supposed to flow under the Company's business model after the transactions were completed and the MSGs were leased, based on witness statements and documents obtained in the investigation:



11.     I have identified at least 12 investors who have entered into deals with the Company through the creation of approximately 33 investments funds.  Some of the investors have invested through more than one fund.  The investors, through the investment funds, have collectively deposited by interstate wire transfer approximately $675,649,000 into bank accounts for the funds that were set up by the Company for the transactions.  Additionally, two other financial institutions (ST Bank & CM Bank) transferred collectively $86,420,000 to the Company as part of a similar transaction for the purchase and lease of MSGs.

12.     I am aware that many of the investors have claimed tax credits and deductions in connection with the transactions premised on the revenue allegedly being generated by the leases of the MSGs to third parties.

13.     Further, in at least one other instance, Individual 1 and others affiliated with the Company solicited loans from a third party bank based, in part, on the lease revenue generated by the MSGs.  In another instance, Individual 1 and others sought out another financial institution (K Bank) as a potential investor and used the projected lease revenue from third party leases managed by the Company as the proposed revenue stream to pay K Bank.  Individual 1 and others made specific representations to K Bank that certain entities, including Telecom Company A, had contracts in place with Company D to lease hundreds of MSGs that would generate over $13 million in revenue per year.

14.     Overall, the total amount of investor money through the transactions, as well as money from financial institutions provided to the Company, is approximately $810,738,000.  No less than $795,738,000 has been identified as money provided to the Company in connection with the sale and lease of MSGs.

15.     Based on an analysis of bank records and witness interviews, among other evidence, I believe that Individual 1 and others have knowingly misrepresented the existence of lease revenue from third parties that was integral to all of the Company's transactions.  In particular, the Company has claimed that Company D has generated tens of millions of dollars in lease revenue from third parties leases, and that these leases are based long-term and short-term lease agreements with third parties.

16.     In truth, the evidence developed in the investigation to date demonstrates that over 90% of the money that Company D has claimed as lease revenue, and which it has used to pay the investment funds, was actually the result of transfers from Company S.  The money from Company S is investor money as Company S has very little other significant sources of revenue or income other than through the investment funds.  The evidence developed so far demonstrates that Company S is the primary source of income for Company D and merely pays obligations due to investors with money raised from that investor and later investors.

17.     Based on my training and experience, I recognize the flow of investor money from Company S to Company D and then from Company D to the investment funds has permitted and continues to permit Individual 1 and others to conceal the absence of third party leases and to create the appearance that the MSGs are generating lease revenue when they are not.  In my training and experience, the use of investor money to lull investors into believing the transaction is legitimate and profit making is evidence of a Ponzi-type investment fraud scheme.

18.     Further, based on documents obtained through the investigation in this case, the Company has represented that no less than 12,000 MSGs had been manufactured and were in use as of March 2018.  In truth, according to one witness, it appears as few as 3,000 to 5,000 MSGs had been assembled as of February 2018.  Further, Individual 1 and others have represented, as recently as June 2018, that Telecom Company A had leased hundreds of units generating millions of dollars in lease revenue annually.  In truth, the vast majority of MSGs that the Company has manufactured and sold to the investment funds are stored in lots throughout California and elsewhere and are not in use and Telecom Company A has paid no more than approximately $500,000 in annual lease payments.

19.     Based on an analysis of bank records and other documents obtained through the investigation, the Company has received at least $795,738,000 as proceeds from the investment and tax

fraud scheme described herein.  Further, this amount of fraud proceeds constitutes no less than approximately 94% of all of proceeds that Company S has received.

20.     A review of bank and title records also demonstrates that Individuals 1 and 2 have used funds generated from their investment and tax fraud scheme to purchase real property as well as engage in other monetary transactions in excess of $10,000.  This includes the purchase of real property as well as personal property, including over 90 vehicles.

21.     Based on a review of bank records, at least 57 bank accounts have been identified into which criminally-derived funds have been deposited, including business accounts for the Company, investment fund accounts, and personal accounts, including many limited liability companies through which Individuals 1 and 2 have purchased real property, including commercial and residential properties.

## II.     BACKGROUND

### A.     Agent Background

22.     I am a Special Agent with the Federal Bureau of Investigation, and have been since September 1998.  I am presently assigned to the Sacramento office.  My responsibilities include investigating violations of the laws of the United States including Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1343 (wire fraud); and Title 18, United States Code, Sections 1956 and 1957 (money laundering).  I have participated in numerous investigations involving investment fraud schemes and have participated in the execution of numerous search warrants, including for search of digital devices, including computer, smartphones, and tablets/pads.  Prior to joining the Federal Bureau of Investigation, I worked as an accountant at Ernst & Young.

23.     The facts set forth in this Declaration are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, and organizations or records obtained during the course of the investigation.  This Declaration does not set forth all of my knowledge about this matter, and includes facts as they were known to me as of December 13, 2018.

### B.     Applicable Law

1.     Wire Fraud

24.     Title 18, United States Code, Section 1343 provides, in relevant part, that it is unlawful

for any person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent presents, representations, or promises . . . for the purpose of executing the scheme or artifice or attempting to do so," causes the wires to be used.  It is my understanding, based on my training and experience and in discussing the matter with Assistant United States Attorneys involved in the investigation, that it is no defense to wire fraud that a person may have intended to pay back those to whom false statements were made, or that the person did not intend to cause economic loss.

2.     <u>Conspiracy to Commit Tax Fraud</u>

25.     Title 18, United States Code, Section 371 provides, in relevant part, that it is a felony for "two or more persons [to] conspire . . . to commit any offense against the United States . . . and for one or more of such persons [to] do any act to effect the object of the conspiracy . . . ."

26.     Under Title 26, United States Code, Section 7201, it is a felony to "willfully attempt[] in any manner to evade or defeat any tax imposed . . . or the payment thereof."  And under Title 26, United States Code, Section 7206(2), it is a felony for a person who "willfully aids or assists in, or procures, counsels, or advises he preparation of presentation under, or in connection with any matter arising under, the internal revenue laws, or a return, affidavit, claim, or other document, which is fraudulent or is false as any material matter, whether or not such falsity or fraud is with the knowledge or consent of a person authorized or required to present such return, affidavit, claim, or document."

3.     <u>Monetary Transactions Involving Criminally-Derived Funds</u>

27.     Title 18, United States Code, Section 1957 states, in relevant part, that it is unlawful for any person to knowingly engage or attempt to engage "in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity . . . ."  It is my understanding, based on my training and experience and in discussing the matter with Assistant United States Attorneys involved in the investigation, that wire fraud is a specified unlawful activity, and that a monetary transaction involving a financial institution ensured by the Federal Deposit Insurance Corporation qualifies under § 1957.

### III.        FACTS CONCERNING THE FRUAD UNDER INVESTIGATION

#### A.        Background

28.      In June 2018, the United States Attorney's Office for the Eastern District of California received a referral relating to a possible criminal matter from the Securities and Exchange Commission ("SEC") in Washington, D.C.  It is my understanding that the SEC received information from a whistleblower, hereinafter referred to as Former Employee 1, about a potential investment and tax fraud scheme involving Individuals 1 and 2 and the Company.

29.      In July 2018, I interviewed Former Employee 1, who started that he/she had worked with the Company as an independent broker to solicit investments in the Company with respect to tax benefits for investors.  Over time, Individual 1 offered Former Employee 1 a position at the Company to solicit investors.  Former Employee 1 accepted.  Thereafter, Former Employee 1 was working on a particular transaction when, according to Former Employee 1, he/she discovered evidence that the representations that Individual 1 and others affiliated with the Company made regarding the number of leased MSGs and the amount of lease revenue generated through leases managed by Company D were false.  Former Employee 1 left the Company and, through counsel, contacted the SEC.

30.      Thereafter, the FBI, along with the IRS-Criminal Investigation ("IRS-CI"), began a criminal investigation of Individual 1 and the Company.  Over the course of the investigation, I along with an FBI forensic accountant and an FBI forfeiture investigator, as well as an IRS-CI agent, have reviewed records obtained from financial institutions, public records, and documents provided by Former Employee 1.  I and others have also interviewed former employees of the Company along with employees of some financial institutions, including those who have had interactions with the Company, and including Individuals 1 and 2 and other associated with the Company.  This Declaration is based on the foregoing evidence and the evidence as discussed in more detail below.

**B.** **Facts Demonstrating that Individuals 1 and 2 and Others Have Committed Investment and Tax Fraud**

1. **Individual 1 and others affiliated with the Company have represented that Company D has long-term and short-term leases for thousands of MSGs that are generating tens of millions in annual lease revenue that forms the basis of the Company's business model.**

a. **Interview of Former Employee 1 and the Company Documents**

31. During the investigation, I have interviewed Former Employee 1 on multiple occasions. Former Employee 1 reported that he/she was working as a consultant with a firm that was involved in brokering deals between investors and the Company. Former Employee 1 has prior experience with finding investors for tax-equity funds that sought to obtain tax benefits through investments in alternative energy. Former Employee 1 became familiar with the Company, and Individual 1 in particular, in helping to broker deals between investors and the Company through tax-equity funds or partnerships. Based on these interactions, Former Employee 1 stated how the tax-equity funds or partnerships were formed involving the Company and investors.

32. As Former Employee 1 explained, Company S manufactured or assembled mobile solar generators. The MSGs were valued at $150,000 each based on the future revenues from leases with third parties. The valuations of $150,000 was ostensibly done by a third party but Former Employee 1, who was familiar with the valuation documents, explained that the information used by the third party came from the Company itself. Former Employee 1 explained that he/she went to Individual 1 to get information about leases to give to the third party for the valuation.

33. According to Former Employee 1, the Company marketed the MSGs as a good investment opportunity because investors, through tax-equity partnerships or funds, could receive substantial tax benefits. This included claiming 30% of the transaction of $150,000.00 per unit as a tax credit for alternative energy and also deducting depreciation of the units over a 5-year period. Former Employee 1 explained that there was also a small revenue stream to the investors through the leases that Company D held with third parties, but that the tax benefits were the primary motivation for most investors.

34. Former Employee 1 also explained how the transactions worked. According to Former Employee 1, the Company sold the MSGs to limited liability investment funds, which Former Employee

1 called tax-equity partnerships.  The investment funds were owned 99% by the investors with 1%

2 owned by the manager of the funds.  The managers were affiliated with the Company.  After five years,

3 the ownership structure flipped, with the Company-affiliated manager owning 95% of the fund and the

4 investors owning 5%.  After the 5-year time period, the investors had the option of selling their 5%

5 ownership interest in the fund to the manager of the fund, thus divesting completely their ownership

6 interest in the MSGs.  According to Former Employee 1, this appealed to many investors because, after

7 five years, they would no longer be able to get any further tax benefits and so they could divest their

8 ownership interests in the MSGs.

9       35.     As Former Employee 1 explained it, to purchase the MSGs from the Company, the

10 investors deposited approximately 30% of the transaction price, or $45,000.00 per unit, into a bank

11 account that the Company created for each investment fund.  The 30% figure was used because this was

12 the maximum tax credit that the investors could claim.  Thus, the investors would receive a dollar-for-

13 dollar tax credit based on the 30% of the overall cost of $150,000 per unit they deposited into the fund.

14 Essentially, the investors would begin the transaction by breaking even, and then profiting from the

15 depreciation deductions they also claimed as well as a small amount of lease revenue they received.

16       36.     Company S held a promissory note from the fund for the remaining approximately 70%

17 of the purchase price per MSG.  This note from the tax-equity partnership to Company S would be paid

18 down through the revenue generated by leases that Company D managed with third parties.

19       37.     According to Former Employee 1, as part of the deals, the investment funds leased the

20 MSGs to Company D, which in turn, leased the units to third parties.  On this point, Individual 1 and

21 others at the Company told Former Employee 1, as well as investors and other brokers, that there was

22 constant demand for the MSGs such that Company D could lease them out on short-term and long-term

23 leases without problems.  Former Employee 1 explained that the existence of lease revenue was critical

24 for the tax-equity deals for two reasons.

25       38.     First, according to Former Employee 1, the lease revenue was used as part of the

26 valuation of the MSGs at $150,000.00 per unit.  Former Employee 1 explained that although there were

27 two other methods used for valuation of the MSGs (a market-based approach and a cost-based

28 approach), based on his interactions with investors, the valuation methodology that relied on future lease

revenue was considered the most defensible to investors in claiming the tax credits if challenged by the IRS.

39.     Second, Former Employee 1 explained that the lease revenue was the mechanism for the tax-equity funds to pay the remaining approximately 70% of the MSGs.  From the perspective of the investors, they were primarily interested in the tax savings and not the actual ownership of the MSGs. Because the tax credit was capped at 30% of the overall transaction, paying anything more than 30% of the unit would begin to diminish the remaining tax benefits—*i.e.*, the investors would be paying more than the tax credit.  By having the remaining 70% paid through lease revenue generated by leases that Company D had with third parties, the investors could maximize the tax benefits without incurring any further debt or expenditure of funds.

40.     According to Former Employee 1, Individual 1 and others at the Company often identified that there were thousands of MSGS that were being leased by Company D on long-term leases, typically generating at least $900 per month per unit.  Former Employee 1 also explained that one of the Company's marketing claims was that the tax-equity funds had never missed a payment to Company S because of the steady revenue stream from leases managed by Company D.  Individual 1 and others at the Company also claimed that there was a general pool of MSGs available for shorter term leases, such as concerts or civic functions, which also generated lease revenue.

41.     Further, according to Former Employee 1, Individual 1 and others at the Company stressed to investors not only the consistency of the existing revenue streams but also the claim of nearly unlimited future demand.  These representations were made as part of a sales pitch to investors that the investors could make investments of tens of millions of dollars with the Company as a one-stop tax-equity investment rather than the investors trying to piece together numerous, smaller tax-equity deals involving other alternative energy investments.

42.     Former Employee 1 also described the structure of the company.  According to Former Employee 1, although Company S and Company D were and are technically two separate companies, in practice they operate as a single company.  They are both run out of the same building in Benicia, California, and share personnel and assets.  According to Former Employee 1, Individual 1 is, on paper, the owner of S Company and his wife, Individual 2, is the nominal head of Company D.  However,

according to Former Employee 1, Individual 1 was involved in the overall management of both companies.

43.     Former Employee 1 explained that Individual 2 managed payroll for the Company and was involved in administrative decisions and human resources, and validating the title of MSGs. Company Employee 1 was the CFO of the Company and had access to some financial information at the company but, according to Former Employee 1, often claimed not to have information about lease revenue.  Company Employee 2 was the head of operations of S Company, including the deployment of the MSGs and had information about leases.

44.     Former Employee 1 stated that the Company's headquarters were originally in Martinez, California, but then moved to Benicia, California, in 2016.  Former Employee 1 also reported that the Company has other offices in Southern California, Las Vegas, and in Charlotte, North Carolina.

45.     Former Employee 1 further reported that Lawyer 1, who is the attorney for the Company and Individual 1, was and is very involved in the company.  Additionally, Accountant 1, who is an outside accountant for Individual 1 is similarly very involved in the Company.

46.     Sometime prior to May 2017, Individual 1 offered Former Employee 1 a position at the Company.  The purpose was to have Former Employee 1 continue to solicit investors but to do so from within the Company as opposed to working as an outside broker.  Former Employee 1 was offered a salary plus a commission for each deal that he/she closed.  Former Employee 1 accepted the offer.

47.     Former Employee 1 relayed that when he/she arrived at the Company, Former Employee 1 spoke with Individual 1 about the expenses that Former Employee 1 incurred in moving across the country to work for the Company in Benicia.  Former Employee 1 explained that Individual 1 had previously told Former Employee 1 that the Company would cover the relocation expenses.  Former Employee 1 noticed that the contract with the Company did not include that benefit and spoke with Individual 1 about that.  Individual 1 told Former Employee 1 that his wife, Individual 2, did not want to pay reimbursements to Former Employee 1.  However, according to Former Employee 1, Individual 1 decided to compensate Former Employee 1 and removed $20,000 in cash from a safe in his office at the Company's headquarters in Benicia.  Former Employee 1 stated that Individual 1 did so in a matter-of-fact manner that struck Former Employee 1 has odd.

       b.     **The Company documents include claims about the number of units leased and revenues derived from the leases**

48.     Former Employee 1, prior to his departure from the Company, obtained several hundred pages of documents from the Company.  I have reviewed those documents.  They include, among other things, a report prepared for investors supporting the $150,000 valuation of each MSG, financial statements ostensibly showing the amounts of money Company D claimed as annual lease revenue, a list of leases held by Company D, and a copy of the contractual agreements between the Company and some of the investors.

49.     In particular, one of the documents was a May 2016 appraisal report prepared by A&M Valuation ("A&M").  The report concluded that the MSGs were valued at $150,000 per MSG.  It was claimed this was supported by three different analyses—a cost model, a revenue-stream model, and a market price model.  I have reviewed the report.  I note that cost and revenue-stream methodologies uses by A&M to support the valuation of $150,000 is based on information that was supplied by the Company itself.

50.     Another Company document that Former Employee 1 provided was a copy of 2017 contract between S Company and an investment fund.  Called a "Solar Equipment Purchase Agreement," the contract called for the purchase of 112 MSGs by the investment fund SE Fund XXXI in exchange for $16,800,000 at the price of $150,000 per unit.  Approximately 23% of the price would be paid installments to Company S, including approximately $822,000 at the execution of the agreement, another approximately $2,978,000 upon receipt of funding by S Company, and a final approximately $89,000 within a year of the contract.  The remaining approximately 77% of the purchase price, equaling approximately $12,911,000, would be paid through a promissory note from the investment fund to S Company.  The manager of the fund was SMS, Inc.

51.     The contract promised delivery of all of the MSGs to the investment fund by December 15, 2017.  Individual 1, at the Company's headquarters in Benicia, California, was designated as the point of contact in the contract.  Individual 1 also signed the contract on behalf of S Company.  SMS, Inc. Employee 1 signed on behalf of SMS, Inc.

52.     A related document to the purchase contract included representations about Company D leasing the MSGs that were being purchased by the investment fund.  The document, called a "Limited Guaranty," was executed between Individuals 1 and 2; SMS, Inc. Company Employee 1; Company S; Company D, and SMA, Inc.  The guaranty was for the benefit of Investor Company SW, which was the investor that contributed to the investment fund.  The guaranty recited that the investor was unwilling to make the investment absent certain obligations by the Company and Individuals 1 and 2, including that all of the MSGs would be "placed in service" prior to December 31, 2017, and that the Company would complete all of the necessary documentation so that Investor Company SW could claim the tax credit.  The guarantee was signed by Individual 1, both individually and as "president" on behalf of Company S, and Individual 2, both individually and as "president" on behalf of Company D.

53.     Former Employee 1 also provided an agreement for the formation of the investment fund by Investor Company SW to purchase the MSGs.  The agreement reflected the terms that Former Employee 1 stated above concerning the ownership structure of the investment fund between the investor and the fund manager SMS, Inc., including the flip in ownership after 5 years.  The agreement also included a diagram that showed the flow of money as part of the transaction, including the payment of lease revenue to Company D from the "host/end-user (sublessee)" and financial statements identifying the projected payments from Company D to the investment fund based on the lease revenue that Company D collected from third parties.

54.     Another Company document that Former Employee 1 provided was a list of the investors who transferred money in the various tax-equity investment funds.  Many of those investors invested into multiple, different funds over the course of 2011 through 2018.  The entities include:

- Investor Company AB
- Investor Company FD
- Investor Company SW
- Investor Company DVVNBCR
- Investor Company E/W Bank
- Investor Company ADHI-S
- Investor Company U Bank
- Investor 1

14

- Investor Company PS1
- Investor Company M-REATCF
- Investor Company UF Bank
- Investor Company PCI

55.     Another document was an opinion letter from NP Law Firm dated May 2016 in connection with a potential investment by Investor 1 to purchase several hundred MSGs for hundreds of millions of dollars.  The letter, which was addressed to Investor 1 and the investment fund created for its investment, opined about the tax consequences of the transaction, including potential tax credits for Investor 1.  The opinion letter indicated it was relying on existence of lease agreements with D Corporation and documents as provided by Lawyer 1.

56.     Former Employee 1 also provided a Company document that identified the lease revenue that Company D received from January 1, 2017 to September 30, 2017.  This document claimed that Company D had received $79,579,511 in "rental income" for the first nine months of 2017.  Similar documents for Company D claimed "rental income" of $58,390,613 for the year ending December 31, 2016; $29,845,192 for the year ending December 31, 2015; and $14,234,180 for the year ending December 31, 2014.  These financial documents were each accompanied by a letter from Accountant 1 to the Company D's Board of Directors claiming Accountant 1 had compiled these documents based on information from the "management" of the Company.  Accountant 1 stated he had not audited or reviewed the underlying financial records and made no opinions or assurances about the authenticity of the numbers.

57.     Former Employee 1 also provided a printout from the Company's accounting system dated February 6, 2018.  The print out, entitled Company D Transaction Detail By Account, January through December 2017, had a line-item accounting of the credits to Company D's financial accounts for "rental income."  The document showed that of the approximately $91,000,000 in credits for that account in 2017, over $88,000,000 was from S Company.  The only consistent source of credits from other entities were Raceway Corp. and Telecom Company A, the later which typically had credits of $1,000 and often under the memo line "emergency p…."  As discussed below, this is consistent with the analysis of bank records described below that demonstrate that Company S contributed over 90% of the

monies that Company D claimed as lease revenue, and that Company D received a total of, at most, approximately $14,525,000 from third parties in all of the years 2011 through August 2018.

58.     Former Employee 1 also provided a projection of the number of MSGs to be leased by Company D over the years 2017 through 2021.  The numbers assumed a lease amount of $900 per MSG per month and that Company D would be leasing 12,920 MSGs in 2017 and 15,704 by 2021.  A similar document projected lease revenue for Company D of approximately $117,000,000 in 2017 and $142,000,000 in 2021.

59.     Former Employee 1 also provided a purported lease schedule dated January 31, 2017. The Company document stated that as of that date, there were 8,681 units, of which 7,562 were connected to the tax-equity investments funds.  The document claimed, among other things, that 7,030 MSGs were being leased to various entities for monthly leases between $800 to $1,000 per unit, with the term of the leases varying between 5 and 10 years.  The document also claimed that additional lease agreements for over 8,000 MSGs were in the "pipeline."  As discussed more below, based on witness interviews and surveillance photographs, it does not appear that over 7,000 MSGs were deployed or being leased, including in 2017.  The entities identified in this document as having long-term leases or in the process of leasing MSGs included:

- Telecom Company A
- Raceway, Corp.
- A Rentals
- Company K
- KS Co.
- A Air
- Speedway, Inc.
- V Auto Company
- CC Company
- E Energy Co.
- B Co.
- GNB-E Co.

1    • T Auto Company

2    • P Speedway

3    60.    Additionally, Former Employee 1 provided copies of some leases between Company D

4  and various entities in 2017.  The leases included several by which Company D received no money in

5  exchange for leasing the MSGs, including one with A Air.  The leases were short-term in nature,

6  typically lasting only a few days to a month.  The entities or individuals identified in short-term leases

7  included:

8    • S University

9    • CK9 Co.

10    • SG Investments

11    • F Corp.

12    • AE Utility Co.

13    • Q Telecom, Inc.

14    • PI Raceway

15    • Mr. B Co.

16    • M Chamber of Commerce

17    • PS and T Co.

18    • ACS-R Co.

19    • D&W Co.

20    • TH & Associates

21    • TJS Co.

22    • WaD Co.

23    • H Communications

24    • PA Soccer Club

25    • NA Development

26    • A Air

27    • SB Airport Authority

28    • SNVBM Society

17

- S County Fairgrounds
- OC F&E Center
- BGVB Co.
- SGE&E Co.
- RM Winery
- FH Productions
- CR Soccer Club
- SF Solar

61.     There was also a mid-term lease for 6 months with RJN Co. for $123,000 for 20 MSGs, a two-year lease for B Robotics for weekend rentals at $1,621, and a five-year lease for MF Co. for $600. (Bank records show that the only payment Company D received from RJN Co. was $62,000 in May 2018, and no payments from B Robotics or MF Co.)

62.     Former Employee 1 also provided an email that was sent in October 2016 by Broker 1 that summarized the benefits of investing with the Company through the purchase of MSGs.  Former Employee 1 stated that Broker 1 was one of the brokers involved in setting up deals with the Company and investors.  The email relayed that the investment fund involved in the transaction with the Company would provide a cash flow and tax benefits to the investor, and that Company D would "make rent payments to the Fund using the cash that it gets from subleasing the [MSGs] to end-users.  The Fund will use its rental income to make the payments due on the Loans [to Company S], pay expenses, fees, and make annual cash distributions to the Investor."

63.     Another document that was attached to an email that Broker 1 sent in April 2017 was entitled Company Corporate Presentation.  The presentation described the Company, including that it was founded in 2009 by Individuals 1 and 2, and was headquartered in Benicia, California, with manufacturing and distribution facilities in Benicia, Buena Park, California, and Las Vegas, Nevada, as well as a "national footprint through third party contractors."  The presentation stated the "executive management" as Individual 1, CEO; Individual 2, COO; Company Employee 1, CFO; and Lawyer 1, general counsel.

c.   **Interviews of H Bank Officials**

64.   I have interviewed three current or former employees of H Bank, which was the bank where Company S, Company D, the various investment funds, and Individuals 1 and 2 personally, maintained dozens of bank accounts from 2015 through 2017.  The employees were K.W., the president and former chief operating office of Heritage, D.K., a business development manager responsible for the Company accounts and accounts for Individuals 1 and 2, and G.S., who was branch manager for the Walnut Creek, California, branch.  These individuals had direct interactions with Individual 1 and others associated with the Company, including Individual 2, Company Employee 1, Accountant 1, and/or Lawyer 1.

1.)   K.W., President of H Bank

65.   K.W. stated that he first met with Individuals 1 and 2 in 2015 at the Company offices, which, according to K.W., were then located in North Concord, California.  (Other witnesses have indicated the officers were in Martinez, California.)  The purpose of the meeting was to discuss the banking needs of Individuals 1 and 2 as potential new business for H Bank.  Individuals 1 and 2 showed K.W. and other representatives of H Bank, including D.K. and G.S., around the facility.  Individual 1 also generally stated the Company's business model.  According to K.W., Individual 1 stated that Company S manufactured MSGs.  Investors paid a third of the money to purchase the MSGs, with the Company carrying a note for the remaining purchase price.  The payment of a third of the purchase price covered the costs to manufacture the MSGs along with a small profit to the Company.  The remaining two-thirds of the price was financed by Company S.

66.   Wilton stated that Individual 1 explained that Company D was responsible for leasing the MSGs to third parties.  Individual 1 stated that these were long-term leases, including some up to 25 years in length.  Individual 1 further explained that the third parties paid Company D, which in turn paid the investors, which would use the lease revenue to pay down the note to Company S.  At the end of the lease, the MSGs would be returned to the Company.  K.W. reported that Individual 1 claimed that the Company had already completed some of these deals at the time of this meeting.

67.   K.W. had a second meeting with Individual 1 sometime between July and December 2016.  This meeting occurred at the Company's new headquarters in Benicia, California.  Individual 1

gave K.W. and other H Bank employees who accompanied him a tour of the new facility.  K.W. recalled that he noticed that there was not a lot of manufacturing going on at the new facility.

68.    According to K.W., the purpose of the meeting was to discuss a potential $20 million line of credit to be extended by H Bank to the Company in connection with a new deal the Company was trying to close with Investor 1.  According to K.W., Individual 1 stated that the Company was looking for $20 million in capital to cover the manufacturing costs of building MSGs in connection with a $50 million investment by Investor 1.  K.W. told Individual 1 that H Bank would need to see the leases that Company D had with the third parties as the lease revenue would be the means by which the Company would pay back the $20 million line of credit to H Bank.  According to K.W., Individual 1 became animated and testy when K.W. told Individual 1 that H Bank would need to see the third-party leases.  Individual 1 responded that he was worth $30 million and would personally guarantee the line of credit.  According to K.W., the meeting ended shortly thereafter.  H Bank never extended the line of credit because the Company did not provide the third-party lease documents.

69.    K.W.'s third meeting with Individual 1 occurred early in 2017 at the H Bank's Walnut Creek branch office, where K.W. happened to be visiting.  Individual 1 was stopping in at the branch to introduce SMS, Inc. Employee 1.  According to K.W., Individual 1 explained that he was transferring ownership of SMS, Inc. to SMS, Inc. Employee 1.  Individual 1 told K.W. that his accountant told him that Individual 1 needed to divest himself of a majority ownership in SMS, Inc. because it could affect tax status.

70.    K.W.'s final meeting with Individual 1 occurred in August or September 2017, when K.W., along with D.K., informed Individual 1 that H Bank had decided to end its banking relationship with the Company and Individuals 1 and 2 (aside from some property loans).  K.W. stated that the reason H Bank terminated the relationship was because the size and complexity of the Company's transactions became too labor intensive for the bank.  (I also note, as stated below, by this point an internal fraud analyst at H Bank had identified wire transfers that were inconsistent with the business model for the Company and suggested the possibility of investment fraud.)  K.W. stated that Individual 1 was cordial and made a joke that he had never heard a bank turning down business.  Within approximately 30 days, the Company and Individuals 1 and 2 had moved their accounts to another bank.

2.)   D.K., account manager

71.     I also interviewed D.K., an account manager at H Bank.  D.K. stated she became aware of Individual 1 through a prior colleague when she worked at F Bank.  According to D.K., her former colleague, who was now at another bank, told her that he was aware Individuals 1 and 2 were unhappy with their relationship with F Bank and were looking to a new bank.  Thereafter, Individual 1 called D.K. to arrange a meeting.

72.     D.K., along with G.S., the branch manager at Walnut Creek, attended a meeting at the Company's then-headquarters in Martinez, California.  They met with Individuals 1 and 2.  D.K. said that Individual 1 discussed his solar business.  She had the understanding that Individual 1 and his wife, Individual 2, were co-owners.  D.K. stated that individual 1 discussed the solar business in general. According to D.K., Individuals 1 and 2 expressed dissatisfaction with F Bank, including on-line banking.  Thereafter, the Company opened accounts at H Bank.

73.     According to D.K., she was the primary point of contact with the Company.  If she needed information from the Company to open new accounts or for other reasons, she would typically contact Individual 1 or Lawyer 1, whom she understood was an attorney connected with the Company and Individual 1.

74.     D.K. recalled a meeting several months after the Company began banking at H Bank that occurred at Lawyer 1's office in Walnut Creek, California.  Individual 1, Lawyer 1, and Accountant 1 attended the meeting, along with D.K., G.S., and another employee from H Bank.  The purpose of that meeting was to discuss a potential line of credit from H Bank to the Company.  According to D.K., G.S. explained to Individual 1, Lawyer 1, and Accountant 1 that H Bank would require documentation.  G.S. also asked questions about the Company's business model and plans, and that Accountant 1 answered many of those questions.  D.K. stated that individual 1 was present and did not disagree with the information being presented.  D.K. believes at the meeting that Lawyer 1 presented a chart that showed the relationships between Company S, the investment funds, and Company D, including the flow of money between those entities.

75.     At some point after the meeting, D.K., G.S. and others at H Bank prepared a loan proposal.  According to D.K., as that team was traveling to H Bank's office (where the loan committee

met) in San Jose, they received a call from K.W. inquiring whether Individual 1 had filed his tax return. D.K. then contacted Accountant 1, who told D.K. that Individual 1 had not filed his tax return but sought an extension in relation to a real estate deal.  Because Individual 1 had not filed his tax return, the loan proposal was not submitted to the committee.

76.     D.K. recalled that she later attended a meeting in early 2017 with K.W. and Individual 1 at the Company's office in Benicia to revisit the possibility of the Company obtaining a line of credit. D.K. remembered K.W. asking Individual 1 more questions about the Company, and that K.W. appeared frustrated that Individual 1 was not giving H Bank the answers K.W. needed or being sufficiently transparent about the business.  She also felt that Individual 1 was becoming upset because H Bank was not remembering his prior statements.

77.     After that meeting, Individual 1 continued to discuss the possibility of a line of credit with D.K. D.K. explained that H Bank was not going to provide a line of credit until the Company provided the information that K.W. had requested.  Individual 1 never provided the information, stating that he had already told them the information.  According to D.K., Individual 1 eventually stopped pursuing the line of credit with H Bank.

78.     D.K. also recalled another meeting with Individual 1 at H Bank's Walnut Creek office that was attended by K.W. and SMS, Inc. Employee 1, who was the owner of SMS, Inc.  D.K. stated that Individual 1 provided more specifics about the Company at the meeting, including more accounts and deposits would be forthcoming in relation to the MSGs because the Company had signed more lease contracts.  D.K. recalled Individual 1 speaking about a deal with the Department of Transportation and a few other projects, as well as the Company's relationship with a national auto race company ("Race Company").

79.     Thereafter, according to D.K., the Company's deposits with H Bank began to increase substantially.  K.W. told D.K. to try to get more information about the source of the increased deposits. She made inquiries to Individual 1, who responded and provided information that D.K. sent to K.W.  At some point after this K.W. informed D.K. to set up a meeting with Individual 1 to inform him that H Bank was going to close the Company's accounts.

3.)  <u>G.S., branch manager</u>

80.    In addition to K.W. and D.K., I also interviewed G.S., a former branch manager at H Bank.  G.S. stated that she recalled an introductory meeting with Individuals 1 and 2 in February 2015.  Individual 2 did more of the talking about their banking needs, including the need to do on-line transfers.  Individual 2 explained the need to have a more seamless banking relationship because they had multiple entities.

81.    After the Company and Individuals 1 and 2 started banking with H Bank, G.S. recalled a meeting at the office of Lawyer 1, whom G.S. identified as an attorney connected to Individual 1 and the Company.  G.S. recalled that D.K. was present.  G.S. could not recall if Individual 1 was also present.  She believes Accountant 1, the Company's outside accountant, was also present but was not sure if she was confusing this with another meeting at Lawyer 1's office where Accountant 1 was present.  (As noted above, D.K., who was also at the meeting, recalled that both Individual 1 and Accountant 1 were at this meeting.)  The purpose of the meeting was to discuss a potential line of credit from H Bank to the Company.  G.S. asked Lawyer 1 questions.

82.    G.S. later created, directly or indirectly, documents to be used internally by the bank to explain the Company's business model in connection with the loan application.  G.S. stated that she obtained the information to create the documents primarily from Lawyer 1 and Accountant 1.  During the interview, G.S. reviewed the documents she created and stated that they accurately contained the representations by Lawyer 1 and Accountant 1 as to the Company's business plans.  G.S. stated that she had limited interactions with Individual 1.

83.    G.S. also stated that she was in the process of heading to San Jose in June 2015 with D.K. to present the Company loan package when K.W. inquired whether Individual 1 had filed his tax returns.  G.S. explained this information was deemed important because H Bank was going to require Individual 1 to personally guarantee the line of credit.  G.S. recalled that she and D.K. had previously inquired of Individual 1 about this issue but that they had a difficult time getting the information from him.  They were eventually able to get into touch with Accountant 1, who said that Individual 1 had not paid his taxes or filed a return for the current year.  After learning this, G.S. and D.K. decided not to travel to San Jose because they knew the loan package was not viable.

23

84.     G.S. stated that she and D.K. later had a meeting with Individual 1 to explain that H Bank would not provide a line of credit.  According to G.S., Individual 1 was upset.  This was G.S.'s last significant interaction with the Company before she retired from H Bank in July 2016.

85.     G.S. stated that she recalled that H Bank was always interested in getting more information about the end-users of the MSGs whom, based on the information she was given by Lawyer 1 and Accountant 1, had long-term leases with Company D.  She stated that they never received this information, or information about which entities were making the lease payments.  G.S. did recall that at some point H Bank received information that some of the customers who had leases with Company D included Telecom Company A, Telecom Company B, D Entertainment Company, CP Co., and the CV Music and Arts Festival.  G.S. stated that generally if H Bank received information from Individuals 1 and 2, D.K. was the recipient.  In contrast, G.S.'s primary point of contact for the Company was Lawyer 1 and Accountant 1.

### d.     **Interview of K Bank employee**

86.     I also interviewed B.H., who is an equipment leasing specialist at K Bank.  According to B.H., he was visiting one of K Bank's clients, A Rentals, in 2017 when he saw Company MSGs at A Rentals' facility.  B.H. did some research on the Company and contacted Individual 1 in June or July 2017 to inquire about whether the Company might be a potential client.

87.     Approximately four or five weeks later, B.H. had a meeting with Individual 1 and Company Employee 3, who helped solicit investors for the Company.  Prior to the meeting, B.H. learned that K Bank, through its Philadelphia office, was already involved with the Company as part of a deal involving Telecom Company A.  B.H. was not involved in that deal but was looking for future opportunities with the Company on the West Coast.  (Below I describe aspects of the other K Bank transaction with the Company involving Telecom Company A).

88.     The meeting with B.H. occurred at the Company's office and lasted about 45 minutes to an hour.  In addition to Individual 1 and Company Employee 3, there was another K Bank employee. Individual 1 also introduced the Company's CFO (believed to be Company Employee 1), but the CFO did not stay for the meeting.  Based on the meeting, B.H. understood that Individual 1 and his wife, Individual 2, owned the Company.

89.     Individual 1 talked about the Company's contracts.  He stated that the Company had a couple of customers that had long-term leases of MSGs of five or more years.  He also indicated that other customers had shorter-term leases of 12 months and that still other customers were month to month.  B.H. was told that there were 13,000 to 14,000 MSGs on short-term or long-term leases.  Individual 1 represented that the Company was a billion dollar company, but B.H. noted, based on financial data, that most of the assets were the promissory notes from the investors.

90.     Individual 1 also took B.H. and the other K Bank employee on a tour, showing them how the MSGs were manufactured and talking about how the Company was sponsoring a Race Company race team.  There was a Company-sponsored Race Company racing car in the building.  B.H. saw 10 or more workers assembling MSGs, and there were a couple of completed MSGs located at the facility.

91.     According to B.H., Individual 1 did most of the talking during the meeting.  He appeared knowledgeable about the Company's business.  During this meeting, B.H. discussed only general ways that K Bank might become involved with the Company.

92.     Going forward, B.H. dealt only with Company Employee 3.

93.     According to Former Employee 1, it was in the course of the potential deal with K Bank that Former Employee 1 discovered that Individual 1 and others had been misrepresenting the lease revenue it claimed was being generated by long-term and short-term leases to third parties.

2.     **Former Employee 1 discovers that Company D has only minimal lease revenue and that Company S was actually the source of nearly all of the monies that Company D was claiming as lease revenue.**

94.     Former Employee 1 stated that after he/she began working at the Company, Former Employee 1 was involved in a deal involving $75,000,000 from ST Bank.  Former Employee 1 was informed that the ST Bank deal was made in connection with an agreement between Company D and Raceway Corp., in which Company D would lease to Raceway Corp. and Race Company racetracks approximately 500 MSGs at $900 per MSGs for a period of 10 years.  The lease revenue from Raceway Corp. would be used to pay back ST Bank.  (Based on public documents, Raceway Corp. owns and manages the Race Company racetracks.)

95.     Former Employee 1 stated there was another "sales-lease back" transaction similar to ST Bank but that involved CM Bank.  Former Employee 1 stated that like ST Bank, CM Bank had

purchased MSGs from the Company without financing, and then leased the MSGs back to the Company, which in turn, through Company D, leased them to Raceway Corp. and to the general, short-term lease pool. Former Employee 1 stated that approximately 76 MSGs were included in this deal at $150,000 per unit. A review of bank records shows approximately $11,400,000 from CM Bank to the Company.

96. According to Former Employee 1, he/she later learned that there was side agreement between the Company and Raceway Corp. that the Company would spend a certain amount on advertisements with Raceway Corp. if Raceway Corp. signed the lease agreement. Former Employee 1 also believes he/she heard that there was an agreement that Raceway Corp. could terminate the lease at any time. Former Employee 1 believes he/she heard about these details from Company Employee 4, the vice present of business development and marketing at the Company. (Former Employee 1 had previously stated he/she might also have heard this from Lawyer 1 or Company Employee 1 but clarified that he/she is now more confident it was from Company Employee 4.)

97. After the completion of the ST Bank deal, Former Employee 1 became aware that the IRS was questioning the $150,000 per MSG valuation. This was a potential problem because, if the trailers were not valued at $150,000 per unit, the investors would not be able to receive the tax credits or depreciation that made the deals economically attractive to them. Former Employee 1 believed that so long as the valuation was supported by the lease revenue that Individual 1 and others represented existed, there would not be any problem with the IRS.

98. After the ST Bank deal, Former Employee 1 helped to broker a transaction with K Bank involving MSGs. As part of the transaction, K Bank was providing $27 million to a private equity group called A Group to finance the purchase MSGs. The $27 million from K Bank represented 80% of the overall transaction. The deal would be through a special purpose entity called S-Sense.

99. According to Former Employee 1, this was not the type of tax-equity deal that the Company had mostly used. Rather, A Group, through S-Sense, was going to purchase 416 MSGs that were already owned by two investment funds through earlier tax-equity deals and which, according to Individual 1 and others, were being leased to Telecom Company A as part of a contract by which Telecom Company A was leasing MSGs from Company D. S-Sense would then lease the MSGs back to Company D to continue leasing them to Telecom Company A as part of the purported existing contract

26

between Company D and Telecom Company A.  Thereafter, the Telecom Company A lease revenue would be the source of payment to S-Sense and thus the source of repayment to K Bank.

100.    One of the documents that Former Employee 1 provided was a March 16, 2017 email from Broker 1, a broker, to Individual 1, and copying Accountant 1, and Lawyer 1, that discussed the deal involving A Group.  Broker 1's email attached a presentation that A Group had created to assess the deal.  (Broker 1 received the presentation from an employee at A-Group.)  Broker 1 solicited comments from Individual 1 on the presentation.  The presentation stated, among other things, that a Company affiliate would lease 416 MSGs that were "already deployed at [Telecom Company A's] sites" and were part of a "sub-lease with [Telecom Company A]" that was 10.5 years.  The presentation also stated that the Company had manufactured over 9,000 MSGs.  These representations were consistent with those that, as stated above and below, Individual 1 and others at the Company had made regarding the A Group deal.[1]

101.    Former Employee 1 indicated that the A Group/K Bank/S-Sense deal closed.

102.    After this, Former Employee 1 and Individual 1 began discussing separate deals directly with K Bank.  According to Former Employee 1, in the course of discussing other transactions with K Bank, K Bank began asking for questions about lease contracts that Company D had with third parties.  Former Employee 1 did not consider this an issue because Individual 1 and others had long told Former Employee 1 and other brokers and investors that there were leases in place generating tens of millions of dollars of revenue.

103.    Former Employee 1 stated that he/she initially approached Company Employee 1, the CFO of the Company, for this information as Former Employee 1 expected the CFO to have the information supporting the lease revenue amounts in the financial statements.  Company Employee 1 did not provide Former Employee 1 the underlying lease revenue numbers, which Former Employee 1 found puzzling, but instead directed Former Employee 1 to Company Employee 2, the head of

---

[1]  The presentation identified various individuals affiliated with the Company, including individual 1 (CEO) and Individual 2 (COO) and Lawyer 1 (general counsel).  Accountant 1 was identified as the chief financial officer.  As noted elsewhere, other witnesses and documents show Accountant 1 was an outside accountant and Company Employee 1 was the CFO.

operations.  Former Employee 1 did recall Company Employee 1 stating that Company D needed to "get healthy" financially.

104.    Former Employee 1 then approached Company Employee 2, as Company Employee 1 suggested.  Company Employee 2 provided Former Employee 1 a summary of the leases.  Further, according to Former Employee 1, the summary itself did not appear to add up.  Company Employee 2 suggested Former Employee 1 look into a network drive that had some information.  Former Employee 1 reviewed the network drive but found that, rather than documents showing $90 million in lease revenue for 2017 as the Company had represented to others, Former Employee 1 could only locate documents showing less than $2 million in lease revenue.

105.    Former Employee 1 also spoke with Company Employee 5, who was recently hired as the controller for the Company and had access to the QuickBooks accounting program for the Company.  Working with Company Employee 5 to review the QuickBooks for the Company, Former Employee 1 discovered that the vast majority of $90 million in revenue that Company D claimed for 2017 was actually from transfers from Company S.  Company Employee 5, who appeared not have known of this previously according to Former Employee 1, did not know why these intracompany transfers were being considered revenue by Company D.

106.    After learning this information, Former Employee 1 had a conversation with Lawyer 1, whom Former Employee 1 understood to be the Company's outside counsel and Individual 1's attorney.  This occurred in January or February 2018.  Former Employee 1 explained that K Bank had been asking about lease revenue and that he/she, after reviewing certain of the Company's records, could not find documentation supporting the lease revenue that the Company claimed existed.  According to Former Employee 1, Lawyer 1 could not answer for the discrepancy other than state that there was a "method to the madness."

107.    Thereafter, Former Employee 1 had a meeting with Lawyer 1 and Individual 1 at the Company's headquarters, in Benicia, in January or February 2018.  This occurred within days after Former Employee 1 had discovered the transfers between Company S and Company D.  According to Former Employee 1, Individual 1 confided that it was difficult to lease the units and blamed his employees for not being able to lease them as it was costing the Company up to $500 per unit to store

the idle MSGs.  Individual 1 and Lawyer 1 initially tried to explain why S Company would be transferring money to Company D as somehow related to Company S leasing units from Company D. According to Former Employee 1, as Individual 1 and Lauer made this explanation, they realized it was nonsensical and did not try to further explain it.  Instead, Individual 1 indicated that the Company did not need outside financing from K Bank and that they should no longer consider doing the type of sales-leaseback deals that would be based on entities relying on the revenue stream.

108.    Within days of Former Employee 1 discovering what he believed was evidence of the Company making misrepresentations about lease revenue and the demand for MSGs, Former Employee 1 resigned from the Company.  At some point thereafter, Former Employee 1 received a cease and desist letter from counsel for the Company.

109.    Around the time of his departure, Former Employee 1 retained counsel.  It is believed he/she is seeking compensation through various whistleblower statutes and programs, including through the SEC and the IRS.

### 3. Former Company employee states that the Company's representations about lease revenue and number of MSGs being leased is false.

110.    During the course of the investigation, I interviewed Former Employee 2 on three occasions.  Former Employee 2 stated he was hired as an accountant at the Company in January 2016. He had previously worked as an accountant at a firm and came to know the Company through a former co-worker who was hired by the Company and whose uncle was Company Employee 1, the CFO of the Company.

111.    Former Employee 2 stated that Individual 1 and Company Employee 1 stated to Former Employee 2 the Company's business model.  From these conversations, Former Employee 2 understood that Individual 1 and his wife, Individual 2, owned Company S and Company D.  Company S builds MSGs and bundles them together to sell to investors.  The investors purchase the MSGs at $150,000 per unit.  The investors are motivated by the tax credits and depreciation.  The entity that buys the MSGs is a fund that is owned by a limited liability company.

112.    Based on information provided by Individual 1 and Company Employee 1, Former Employee 2 understood the investment funds leased the MSGs to Company D, which in turn sub-leased

the units to third parties like Telecom Company A.  The investors financed the majority of the $150,000 per unit transaction costs through financing from Company S.  The investors used the lease revenue from Company D's leases to third parties to pay off the loan to Company S.

113.    Former Employee 2 was initially responsible for keeping the books on the properties that Individuals 1 and 2 owned.  According to Former Employee 2, Individuals 1 and 2 own numerous residential and commercial properties, which were held in limited liability companies ("LLC").  Some of the LLCs that Former Employee 2 remembered were named Dora Dog LLC, Dog Blue LLC, and 140 Mason LLC.  Individuals 1 and 2 also bought approximately seven condominiums at Villa La Estancia in Cabo San Lucas, Mexico.  Former Employee 2 would pay the bills on these properties.  He dealt with Company Employee 1 in these activities.

114.    In approximately September or October 2016, Former Employee 2 also started doing accounting for the investment funds.  Former Employee 2 was aware that Company D claimed to have over $55 million in lease revenue for 2016.  However, in reviewing the accounting records, Former Employee 2 discovered that at least $50 million of the $55 million in claimed lease revenue actually came from the Company S bank account and was deposited in to the Company D account.  Former Employee 2 stated that the money from Company S to Company D could not be classified as revenue.

115.    Former Employee 2 stated that he inquired of Company Employee 1 about the payments of funds from Company S to Company D.  According to Former Employee 2, Company Employee 1 would give vague answers or claim that it had to do with an equity deal or that Former Employee 2 should ask Accountant 1 because it dealt with taxes.  (As set forth above, Accountant 1 is the outside accountant for the Company and/or for Individual 1.)  According to Former Employee 2, none of these explanations by Company Employee 1 made any sense.  Further, on at least two occasions, when Former Employee 2 asked Company Employee 1 about property transactions by Individuals 1 and 2, Company Employee 1 responded that Former Employee 2 did not want to know the answer.

116.    Former Employee 2 also recalled that he was once tasked to gather documents to assist in an audit of Company S.  As part of that process, he had to ask Company Employee 1 about a particular transfer from Company S to Company D.  Company Employee 1 told Former Employee 2 to tell the auditors that the transfer was a mistake.

117.     Former Employee 2 could not recall whether he spoke with Individual 1 about the transfers from Company S to Company D.  However, it was his understanding that in order for the transfers to occur, Company Employee 1 signed the transfers and that Individual 2 approved them.

118.     Former Employee 2 also stated that the investors received quarterly documents for the funds from the Company.  For example, some investors received information about which third parties had ostensibly leased, through Company D, the MSGs that the investment funds owed.  Former Employee 2 recalled one instance of having to get this information for an investor group called D Ventures, and that the reports indicated that most of their units were being leased through Company D to Telecom Company A.  Former Employee 2 stated that individual 1 and/or Company Employee 2, head of operations at the Company, verified the authenticity of the reports.  (As discussed below, another witness confirmed that Telecom Company A was, in fact, leasing only a small fraction of the MSGs that the Company claimed and which were included in the report that Individual 1 and/or Company Employee 2 verified as accurate.)

119.     Former Employee 2 stated that the reports included the vehicle identification number ("VIN") for each MSG.  According to Former Employee 2, the Company, or its subcontractor, assigned and affixed to each trailer a unique VIN.  The Company maintained records of MSG by VIN, including which investment fund owned each MSG by VIN and which MSG, by VIN, was leased by which third party through Company D.  Former Employee 2 stated that some investors received reports from the Company, which included this information.  Former Employee 2 stated that, over time, he began to notice that the reports of MSGs, by VIN, being leased to third parties did not change from quarter to quarter.  Former Employee 2 found this unusual as he expected to see that the MSGs on short-term leases should be leased by different entities such that the reports would change.

120.     Former Employee 2 stated that in addition, in April 2017, the Company almost ran out of money because it had been a while since it had received investor money.

121.     Based on the business model that Individual 1 and others explained to Former Employee 1, Former Employee 2, and the employees at H Bank, the Company should not have been dependent on investor money to stay afloat.  Rather, the revenue from third-party leases managed by Company D was, based on representations by Individual 1 and others, the primary source of revenue.  Based on my

training and experience, the fact that, according to Former Employee 2, the Company nearly ran out of money in 2017 because there were no recent investments is evidence that the Company was operating as an investment fraud dependent on new investor money to pay prior investors.

122.    Former Employee 2 stated that, based on the Company's business model and the amount of investor funds that the Company had received, the Company should have manufactured and leased 13,000 to 14,000 MSGs by the end of 2017.  (Former Employee 2 had stated during his first interview that he initially thought that up to 16,000 MSGs should have been manufactured based on the amount of investment funds.)  According to Former Employee 2, there was very little revenue being generated, and he believes that this was known to Individuals 1 and 2 as well as Company Employee 1.  (Further, as stated in more detail below, another former Company employee, Former Employee 4, also stated that the Company was not leasing very many MSGs and that these were not generating very much revenue).

123.    Former Employee 2 stated that the culture at the Company was that everything was compartmentalized and that the general rule was employees were to keep to their own work.  According to Former Employee 2, Individual 2 had the role of gatekeeper and indicated that if Former Employee 2 needed certain information from other departments he was to go to her and not other Company departments.  Former Employee 2 recalled one instance when he went to Company Employee 2, head of operations, to get information about where some units were being leased.  Individual 2 scolded Former Employee 2 that he should get that type of information directly from Individual 1.

124.    According to Former Employee 2, in December 2017, he was terminated from the Company.  Former Employee 2 believes it was because he provided bank records to SMS, Inc. Employee 1, who was then running SMS, Inc., the company that managed most of the investment funds. (As noted below, although SMS, Inc. and other companies ostensibly manage most of the investment funds, Individuals 1 and 2 are the signatories on most of the funds' bank accounts.)  Former Employee 2 stated that Individuals 1 and 2 were both very upset that Former Employee 2 had given bank statements to SMS, Inc. Employee 1 without first consulting with them.  Former Employee 2 also stated that he was reprimanded because he gave another Company employee access to a secured file room and had also given the wrong documents to a bank.

125.    Prior to his termination, in May 2017, Former Employee 2 and another Company

1    employee, went to an attorney to report what they believed was fraud.  Former Employee 2 stated that

2    the attorney informed them that because the IRS was already auditing the Company, they could not

3    qualify as a whistleblower.

           4.     **Evidence of further misrepresentations about the Company's contracts with and lease revenue from Telecom Company A.**

              a.     **Individual 1 represented that the Company has leased hundreds of MSGs to Telecom Company A generating millions in revenue.**

126.    As stated above, both Former Employee 1 and G.S. at H Bank stated that Individual 1

identified Telecom Company A as an example of a company to which Company D was leasing MSGs

on a long-term contract.  Additionally, as also stated above, B.H., from K Bank, and Former Employee 1

also stated that they were aware of a transaction in which K Bank provided financing to A Group in

connection with a transaction through S-Sense was purchasing MSGs purportedly leased by the

Company to Telecom Company A.

127.    I also interviewed S.S., from K Bank's asset recovery group.  According to S.S., in April

2018 he became aware of a deal between K Bank and the Company when concerns were being raised at

K Bank about the existence and location of MSGs that, according to the Company, were being leased by

Telecom Company A.  S.S. reviewed documents and spoke with people at K Bank and learned that in

July 2017, K Bank had lent money to a fund called S-Sense that was purchasing 416 MSG from the

Company.  K Bank was financing the deal.  S-Sense was then leasing the MSGs back to Company D,

which in turn, according to the Company, had a deal in place to lease them to Telecom Company A.

The revenue from Telecom Company A was the basis by which K Bank would get repaid.

128.    S.S. was informed that the 416 MSGs that were connected to the K Bank/S-Sense deal

were part of a larger, long-term contract purportedly between Telecom Company A and the Company.

S.S. reviewed the contract, which appeared to obligate Telecom Company A to pay the Company $1,100

per month per unit for a total of 1,000 units beginning in September 2015.  S.S. found it odd that

Telecom Company A's corporate name was not consistent throughout the contract, and that it appeared

to be signed by a former employee of Telecom Company A, who was later hired by the Company.  K

Bank questioned whether that employee had the authority to enter into a contract that, according to the

Company, was worth over $100 million from Telecom Company A over the term of the contract.

Lastly, S.S. also questioned the authenticity of an amended contract, purported to be signed the same day by the same employee of Telecom Company A, that lengthened the contract by two additional years from ten years to twelve years.

129.   According to S.S., questions began to be raised after K Bank hired a third party company called QuickPro to select a random sample of the 416 MSGs that were part of the K Bank/S-Sense deal and see if they were located at the Telecom Company A sites as represented in reports that the Company provided to investors.  QuickPro selected 10 random MSGs to verify their location and conducted the inspection between March 19, 2018, and April 3, 2018.  QuickPro could not find any of the 10 units that were part of the inspection.  S.S. explained that many of the MSGs might be difficult to locate because they were on private property in rural areas that were not readily accessible.  However, based on these results, K Bank decided to do a more thorough audit.

130.   According to S.S., K Bank hired another company, Asset Control Services, to verify the existence and location of the 416 MSGs.  Asset Control Services conducted their audit between April 17 and 18, 2018.  Asset Control Services was able to verify the existence of 175 MSGs out of the 416 that were connected to K Bank/S-Sense, which itself was within the overall purported deal involving 1,000 MSGs with T-Mobile.  Of the 175 MSGs, only 16 were found at Telecom Company A cell tower locations.  The remaining 159 were in storage and not being deployed or used.  In particular, 96 MSGs were being stored at the Las Vegas Motor Speedway and 63 at the Company headquarters, in Benicia, California.

131.   It was at this point that S.S. became involved with the Company.  According to S.S., on April 18, 2018, he flew to Las Vegas to participate in the location of the MSGs in Nevada.  S.S. met with Individual 1 the following day, April 19, 2018.  Together with another K Bank employee and a representative from S-Sense, they toured the Company's offices in Las Vegas and then travelled to the Las Vegas Speedway.  The group verified, by VIN number, that 96 of S-Sense's MSGs were being stored at the speedway.  S.S. stated that he saw an additional 100 MSGs that Individual 1 said were not owned by S-Sense but were also being stored there.

132.   After the group left the speedway, they stopped at a coffee shop.  While there, Individual 1 told S.S. that Telecom Company A had stopped making payments to the Company in February 2018.

He claimed that Telecom Company A owed the Company $2.1 million and that this would increase to $2.8 million by the end of the month (April 2018).  Individual 1 claimed that he was working with Telecom Company A to reinstitute the payments, but sought to assure S.S. that the Company would make payments to S-Sense to payoff K Bank's loan and that MSGs could be reallocated to Race Company facilities.

133.    Individual 1 claimed that Telecom Company A had been making payments but that these stopped because of change in management.  He claimed that January 2018 was the first time that Telecom Company A rejected the invoice for payment from the Company.  According to S.S., Individual 1 explained that he was going to remove MSGs from Telecom Company A cell tower cites to try to pressure them.

134.    Based on Individual 1's statements about Telecom Company A, S.S. was concerned because the lease between the Company and Telecom Company A was the basis for K Bank's decision to finance the S-Sense deal, which Individual 1 was now saying was no longer in effect, and without the revenue stream from Telecom Company A there was a concern about how K Bank would get repaid.  S.S. said he stressed with Individual 1 the importance of the contract between the Company and Telecom Company A as it related to K Bank's loan, and that Individual 1 appeared to get agitated.

135.    Thereafter, S.S. had two or three more direct conversations with Individual 1.  These occurred by telephone and S.S. described them as poor communications because there was a lot of over-talking.  S.S. did recall that Individual 1 inquired about why K Bank wanted to terminate its relationship with the Company.  S.S. stated that, on behalf of K Bank, he requested evidence of the prior lease payments by Telecom Company A to the Company consistent with Individual 1's representations.  According to S.S., the Company never provided evidence of prior lease payments other than their internal QuickBooks reports, on which K Bank was unwilling to rely.

136.    According to S.S., on May 24, 2018, he participated in a conference call involving Individual 1 and others from S-Sense and K Bank was well as a "tax guy" connected with the Company.  (Based on the witness statements stated above, I believe the "tax guy" was Accountant 1, who is Individual 1 and the Company's outside accountant.)  Individual 1 stated that he was still working to resolve the situation with Telecom Company A and asked for more time.  He claimed that the

Company's relationship with Telecom Company A was larger than the MSGs that were the S-Sense/A Group/K Bank deal, and so he was reluctant to pressure Telecom Company A.  S.S. specifically asked Individual 1 if Telecom Company A had been making the payments on the contract and Individual 1 stated that it had.  S.S. asked Individual 1 for verification of the payments made to the Company from Telecom Company A and for the invoices that the Company sent to Telecom Company A.  The Company did not provide the requested information.

137.    On June 5, 2018, S.S. again spoke with Individual 1 on a conference call and again requested the same documentation.  The Company never provided the documentation and K Bank moved forward to force repayment.  (Based on bank records, between June 2018 and August 2018, the Company paid K Bank, via S-Sense, approximately $24,940,000, which was the remaining balance owed to K Bank from the financing it provided in the deal.  Based on a review of bank records, the source of the funds that Company S used to repay K Bank appears to be other investors' money.)

138.    Additionally, Former Employee 1 stated that he/she had a conversation with Former Employee 3, who was the director of public partnership at Freedom, which was a Company affiliate involved in providing free MSGs as a marketing tool.  Former Employee 3 left the Company in June 2018.  Former Employee 1 said that Former Employee 3 stated that after K Bank/A Group started trying to confirm the existence of MSGs deployed at Telecom Company A sites, the Company had employees working overtime and through the night to drive MSGs to various Telecom Company A sites.  Former Employee 3 suggested this was not normal practice and was done to make it appear that the MSGs were already deployed at those locations.

b.    **Former Company employee states there never was any large-scale agreement with Telecom Company A that generated millions in lease revenue for the Company.**

139.    During the course of the investigation, I interviewed Former Employee 4 on two occasions.  Former Employee 4 worked at the Company and was also the Telecom Company A employee who S.S. noted had signed the contract that purportedly committed Telecom Company A to lease 1,000 MSGs per year for 12 years.

140.    Former Employee 4 stated that he joined the Company in November 2015.  He formerly worked at Telecom Company A as a field manager in Northern California.  According to Former

Employee 4, Telecom Company A was looking to save money with respect to backup generators during power outages.  In this effort, he was introduced to Individual 1 in 2013.  Former Employee 4 met Individual 1 at the Company's offices at Mason Circle, in Concord, California.  Individual 1 demonstrated the capabilities of the MSG.  Former Employee 4 said the MSGs fit what Telecom Company A needed for backup generators and, at $1,000 per unit per month, would be cheaper than renting a traditional, diesel-powered generator.  It was also a green energy source that appealed to Former Employee 4 and Telecom Company A.

141.     As a consequence, the Company was approved as a vendor for Telecom Company A. Telecom Company A did not enter into a long-term lease agreement with the Company.  Rather, the relationship was that Telecom Company A would rent MSGs on a short-term, as-needed basis.  Telecom Company  A would only pay the Company when the Company brought the unit to the designated site and when Telecom Company A actually was using the MSGs.  Telecom Company A did not pay for MSGs if they were not deployed and in use.  According to Former Employee 4, between 2013 and 2015, the revenue that Telecom Company A was slowly increasing until it reached approximately $500,000 per year from 2015 through 2017, when Former Employee 4 left the Company in February 2017.

142.     Former Employee 4 said that while he was at Telecom Company A he tried to get other regions at Telecom Company A to contract with the Company, but was only able to bring in the Sacramento market.  The other regions were not interested.

143.     During his time at Telecom Company A, Former Employee 4 worked directly with Individual 1 and Company Employee 2.  Each was aware of the limited nature of Telecom Company A's relationship with the Company.

144.     Former Employee 4 said that while he was at Telecom Company A, Individual 1 often offered Former Employee 4 a job at the Company.  Eventually he accepted and began working at the Company in November 2015.  He was placed in charge of the Telecom Company A contract.

145.     Shortly before he left Telecom Company A, Company Employee 2 provided Former Employee 4 with a contract.  Former Employee 4 stated that Company Employee 2 explained that the contract provided that, in the case of need, Telecom Company A had priority to rent 1,000 MSGs at

$1,100 per trailer.  Former Employee 4 signed the contract in September 2015.  (As discussed above, this is the same contract at to whose legitimacy S.S. questioned.)

146.     Former Employee 4 explained that it was his belief and understanding that the contract did not require Telecom Company A to lease any MSGs.  Rather, he was told by Company Employee 2 that the contract merely memorialized the understanding that the Company was committed to making 1,000 MSGs available to Telecom Company A for their use.  Former Employee 4 explained that Telecom Company A never paid for MSGs other than those that were deployed and used, and they never paid on the contract other than in those instances.  I asked Former Employee 4 whether he had an understanding that the Company expected Telecom Company A to pay it over $100 million based on the total life of the contract.  Former Employee 4 said that was not the case.  Telecom Company A never paid the Company more than $500,000 in any year and the Company never demanded Telecom Company A pay a total of $13,200,000 annually.

147.     During the interview, Former Employee 4 also reviewed an amended contract that was purportedly signed by him the same day in September 2015, and which extended the agreement between Telecom Company A and the Company from ten years to twelve years.  Former Employee 4 stated that he did not sign the contract and did not recall ever seeing it.

148.     Former Employee 4 stated that after he began working at the Company it became clear that he did not have a well-defined job assignment.  Former Employee 4 stated that he tried to find ways to improve the deployment of the MSGs but that Individual 1 and others at the Company were not interested.

149.     Former Employee 4 stated that Telecom Company A was the largest customer, but was only generating about $500,000 annually from the limited number of MSGs it was using.  Former Employee 4 indicated that there were five MSGs being leased and used by Telecom Company A regularly, and, at most, up to thirty per month on an emergency basis.

150.     Former Employee 4 also noted that the Company did deploy trailers for very limited engagements like music festivals and summer events, but that these would generate only about $500 per unit for a short duration.  The Company was also deploying MSGs to colleges for free.  The only other significant source of revenue relating to MSGs were deployments at Race Company racetracks.

According to Former Employee 4, Company Employee 2, head of operations, and Company Employee 4, head of marketing, were privy to the details of deal with Race Company.

151.    As part of Former Employee 4's job, he had access to information about the number and location of MSGs being deployed.  According to Former Employee 4, the location of each MSG, by VIN, could be accessed on-line through computers at the Company's headquarters, and the location data was provided through GPS coordinates.  Based on the GPS data that Former Employee 4 accessed, he saw that not many MSGs were being deployed.  Rather, most of the MSGs were being stored in a few locations.

152.    In particular, while working at the Company, Former Employee 4 discovered that 500 to 1,000 MSGs were being built and stored in Visalia, California, by an entity called US Tower.  Based on the GPS trackers in the trailers, Former Employee 4 saw that 500 were located there but visually he counted nearly a thousand.  Former Employee 4 spoke with Individual 1 about what the Company was going to do with all of these unused MSGs that US Tower was manufacturing and then storing, but Individual 1 provided no answer.  He asked Company Employee 2, head of operations, the same question and also received no answer.

153.    Former Employee 4 also stated that based on the GPS transponders, he saw that several hundred MSGs were being stored in a large warehouse at the Company's facility in Las Vegas.  Former Employee 4 stated that MSGs were stored in Benicia, California, and Las Vegas.  He was not sure about the Company's office in Charlotte, North Carolina.  He believed that was primarily a maintenance office.

154.    Over time, Former Employee 4 determined that the revenue that was being generated by the leases could not support the Company, and in particular the amount of money that Individuals 1 and 2 were spending.  Former Employee 4 was also informed by Company Employee 2 that only approximately 5,000 MSGs had actually been manufactured and that VIN numbers assigned to trailers without solar panels were being used in reports to investors.  Former Employee 4 also indicated during a follow-up interview that based on his knowledge, perhaps as few as only 3,000 MSGs were manufactured.

155.    Former Employee 4 also stated that he noticed that the same VIN were being used on reports for different investment funds.  Former Employee 4 asked Company Employee 2 about the use of the same VIN for different investment funds, and Company Employee 2 told Former Employee 4 not to worry about it.  Former Employee 4 further stated that he overheard Company Employee 2 and Individual 1 talking about Company Employee 2 creating another set of the MSG deployment/location records from the ones that Former Employee 4 gave to Company Employee 2.  Individual 1 told Company Employee 2 to get a safe to protect the second set of records that Company Employee 2 created.  Former Employee 4 indicated that some investors wanted this data and others did not.

156.    According to Former Employee 4, he also learned that the Company had buried GPS transponders to give the impression that MSGs were at locations where, in truth, they were not located. Former Employee 4 stated that he heard from one of the employees he supervised that the brother of Individual 2 was telling employees that Company Employee 2 ordered the brother to bury GPS transponders at Telecom Company A sites so that they would read on-line that MSGs were at these sites. Former Employee 4 confronted Company Employee 2 who denied it but then told the brother to "keep his mouth shut."  This episode was one of the reasons that Former Employee 4 decided to leave the Company.

157.    As discussed above, in May 2017, Former Employee 4 accompanied Former Employee 2 to speak with an attorney to inquire about a whistleblower lawsuit.  As noted, the attorney told them there was no viable lawsuit.

5.    **Bank records show that the Company provided no less than 90% of the money that D Company claimed was lease revenue from third parties.**

158.    During the course of the investigation, I interviewed S.Z., who works as a fraud analyst at H Bank.  S.Z. stated that she was asked to review the Company's accounts after there was an increase in transactions involving the Company.  S.Z. stated that based on a review of the bank records, she discovered a circular flow of cash that was not consistent with the Company's business model based on the information she had.  (This information was from the meetings that G.S. and others at H Bank had with Individual 1 and others at the Company.)  In particular, S.Z. saw that Company S made large payments to Company D, and that Company D then used this money to make payments to the

investment fund LLC accounts.

159.    I also have obtained records from First Republic Bank, Fremont Bank, Heritage, CTBC Bank Corp. USA, formerly China Bank Trust Bank USA ("CTBC"), J.P. Morgan Chase Bank ("JPMC"), and Bank of America ("BofA"), among others.  Each of these entities at some point in time held bank accounts for Company S and Company D, Individuals 1 and 2, including the limited liability companies through which they purchased and owned real property, and/or the investment funds in connection the Company's business.  It is my understanding that each is insured by the Federal Deposit Insurance Corporation.

160.    Bank accounts in the name of investment funds, Company S and Company D were opened at First Republic, Fremont, Heritage and CTBC.  For most of these accounts for the investment funds and the Company accounts, the signatories on the accounts were Individuals 1 and 2, as well as their now adult children.  Company Employee 1, the CFO of the Company, was a signatory of some of the accounts too.

161.    The investment fund names, and the names of the corresponding bank accounts, followed a regular pattern.  The first bank account opened was for SE Fund III and the second was SE Fund.  (For some reason, there was no SE Fund II and it is presently unknown why account III was opened first.)  Beginning with SE Fund III, each of the next funds was followed by an ascending roman numeral, with the exception of roman numerals XIII, and XXV that had no corresponding funds.)  The most recent fund is SE Fund XXXIV LLC.  Two other similar funds were opened with the names USB Company Fund I and USB Company Fund II.  There have been a total of 33 investment funds with corresponding accounts.

162.    Individuals 1 and 2 opened a bank account for the first investment fund, called SE Fund III, at First Republic Bank in 2010.  This was the bank where the Company and Individuals 1 and 2 were banking at that time, with Individuals 1 and 2 opening an account for Company S at that bank in 2009.  While at First Republic Bank, Individuals 1 and 2 opened separate accounts for the approximately 11 investment funds that were created before Individuals 1 and 2 stopped banking at First Republic Bank on December 31, 2014.

41

163.    After First Republic Bank, Individuals 1 and 2 banked at Fremont Bank.  Individuals 1 and 2 opened accounts at Fremont Bank for each of the eleven existing investment funds, as well as for Company S and Company D.  Individuals 1 and 2 were only at Fremont a short period of time, where they opened at least one additional investment account.

164.    Thereafter, they moved to H Bank in March 2015.  As they did previously, Individuals 1 and 2 opened accounts at H Bank for each of the existing investment funds and then opened new accounts for the investment funds that were created after the move for H Bank.  As noted above, in September 2017, H Bank closed the Company affiliated accounts.  At this time, individuals 1 and 2 had opened 30 bank accounts at H Bank in relation to investment funds.

165.    Individuals 1 and 2 then opened accounts in the name of these investment funds and Company S and Company D at CTBC in September 2017.  They have continued to open up additional bank accounts at CTBC in relation to new investment funds that have been created.  The most recent banks that were opened by Individuals 1 and 2 at CTBC were for SE Fund XXXIII and SE Fund XXXIV, each of which was opened in June 2018.

166.    In addition to these bank accounts that Individuals 1 and 2 moved ultimately to CTBC, a bank account in the name of SE Fund IX was opened at JPMC.  This account was not opened by Individuals 1 and 2 and has remained at JPMC since it was opened in July 2014.

167.    An FBI forensic accountant and I have reviewed these records.  Based on this review, at least $810,000,000 was transferred to Company S from investors and financial institutions, including ST Bank, CM Bank, and other banks.  Based on the witness statements and documents provided, there is probable cause to believe that no less than $797,000,000 has been provided to the Company in connection with the sale and lease of MSGs.

168.    For all of the investment funds accounts that were reviewed, with one exception, there has been a pattern of money being transferred from bank accounts at Company S to bank accounts at Company D in close proximity to the payment of the purported lease revenue from Company D to the investment funds.

169.    This pattern of money transfers from Company S to Company D to the investment funds has continued at CTBC for those investments funds that were due lease payments.  (Accounts for two of

the earliest investment funds—SE Fund and SE Fund III—had minimal activity because the MSGs for those investment funds had been sold to another entity.)  For example, in July 2018, there were approximately 29 transfers from Company D to accounts for the investment funds.  That same day, there were 29 transfers from Company S to Company D in the same amounts as the transfers to the investment fund.  The transfers from Company S to Company D were made often within minutes of the corresponding transfer from Company D to the investment funds.  (One account for Fund XXXIII was opened in July 2018 and that fund was not due to receive any lease payments in July 2018.)

170.    On August 31, 2018, there were five large transfers of money from S Company (CTBC account-ending 1916, signatories Individuals 1 and 2, and their adult children) totaling $12,317,991.82 to Company D (CTBC account-ending 1932, signatories Individuals 1 and 2 and their children).  At the time of those transfers, Company D had only approximately $136,000 in its account.

171.    That same day, there were approximately 51 payments from Company D to the following investment funds at CTBC (many of the funds received multiple transfers) and another to S-Sense.  The total payments to the investment funds and S-Sense was $11,947,551.82.  The below chart identifies each of the payments to the investment funds:

| | Account Number (Last four) | Account Name | Signatories | Payment |
|---|---|---|---|---|
| 1 | 2286 | SE Fund XXIII | Company Employee 1 | $1,596,000.00 |
| 2 | 2377 | SE Fund XXIX | Individuals 1 and 2 & children | $1,596,000.00 |
| 3 | 2237 | SE Fund XVIII | Company Employee 1 | $837,900.00 |
| 4 | 0951 | SE Fund XXXIV | Individuals 1 and 2 & children | $658,800.00 |
| 5 | 3682 | SE Fund XXXIII | Individuals 1 and 2 & children | $560,000.00 |
| 6 | 2724 | SE Fund XXXII | Individuals 1 and 2 & children | $301,000.00 |
| 7 | 2187 | SE Fund XVI | Company Employee 1 | $241,765.50 |

| 8 | 2187 | SE Fund XVI | Company Employee 1 | $241,765.50 |
| 9 | 2187 | SE Fund XVI | Company Employee 1 | $241,765.50 |
| 10 | 2187 | SE Fund XVI | Company Employee 1 | $241,765.50 |
| 11 | 2641 | SE Fund XXVII | Individuals 1 and 2 & children | $220,500.00 |
| 12 | 2005 | SE Fund IV | Individuals 1 and 2 & children | $201,471.25 |
| 13 | 2005 | SE Fund IV | Individuals 1 and 2 & children | $201,471.25 |
| 14 | 2005 | SE Fund IV | Individuals 1 and 2 & children | $201,471.25 |
| 15 | 2005 | SE Fund IV | Individuals 1 and 2 & children | $201,471.25 |
| 16 | 2278 | SE Fund XXII | Company Employee 1 | $174,937.50 |
| 17 | 2039 | SE Fund VII | Individuals 1 and 2 & children | $170,250.00 |
| 18 | 2088 | SE Fund VIII | Individuals 1 and 2 & children | $166,845.00 |
| 19 | 2609 | Se Fund XIV | Company Employee 1 | $165,710.00 |
| 20 | 2179 | SE Fund XII | Company Employee 1 | $162,788.75 |
| 21 | 2161 | SE Fund XI | Company Employee 1 | $161,177.00 |
| 22 | 2161 | SE Fund XI | Company Employee 1 | $161,177.00 |
| 23 | 2161 | SE Fund XI | Company Employee 1 | $161,177.00 |
| 24 | 2161 | SE Fund XI | Company Employee 1 | $161,177.00 |
| 25 | 2245 | SE Fund XIX | Company Employee 1 | $141,312.50 |

| 26 | 2617 | SE Fund XV | Company Employee 1 | $138,632.00 |
| 27 | 2393 | USB Company Fund II | Individuals 1 and 2 & children | $120,882.75 |
| 28 | 2021 | SE Fund VI | Individuals 1 and 2 & children | $108,794.50 |
| 29 | 2229 | SE Fund XVII | Company Employee 1 | $100,750.00 |
| 30 | 2013 | SE Fund V | Individuals 1 and 2 & children | $88,647.33 |
| 31 | 2013 | SE Fund V | Individuals 1 and 2 & children | $88,647.33 |
| 32 | 2013 | SE Fund V | Individuals 1 and 2 & children | $88,647.33 |
| 33 | 2013 | SE Fund V | Individuals 1 and 2 & children | $88,647.33 |
| 34 | 2260 | SE Fund XXI | Company Employee 1 | $87,080.00 |
| 35 | 2369 | SE Fund XXIV | Company Employee 1 | $87,080.00 |
| 36 | 2674 | SE Fund XXVIII | Company Employee 1 | $87,080.00 |
| 37 | 2260 | SE Fund XXI | Company Employee 1 | $87,080.00 |
| 38 | 2369 | SE Fund XXIV | Company Employee 1 | $87,080.00 |
| 39 | 2674 | SE Fund XXVIII | Company Employee 1 | $87,080.00 |
| 40 | 2260 | SE Fund XXI | Company Employee 1 | $87,080.00 |
| 41 | 2369 | SE Fund XXIV | Company Employee 1 | $87,080.00 |
| 42 | 2674 | SE Fund XXVIII | Company Employee 1 | $87,080.00 |
| 43 | 2260 | SE Fund XXI | Company Employee 1 | $87,080.00 |

| 44 | 2369 | SE Fund XXIV | Company Employee 1 | $87,080.00 |
| 45 | 2674 | SE Fund XXVIII | Company Employee 1 | $87,080.00 |
| 46 | 2690 | SE Fund XXXI | Company Employee 1 | $85,680.00 |
| 47 | 2690 | SE Fund XXXI | Company Employee 1 | $85,680.00 |
| 48 | 2690 | SE Fund XXXI | Company Employee 1 | $85,680.00 |
| 49 | 2690 | SE Fund XXXI | Company Employee 1 | $85,680.00 |
| 50 | 2153 | SE Fund X | Individuals 1 and 2 & children | $82,416.00 |
| 51 | 2385 | USB Company Fund I | Individuals 1 and 2 & children | $80,588.50 |

172.    The use of money from Company S as the source of the payments to the investment funds from Company D is also demonstrated based on the overall amount of transfers from Company S to Company D.  In particular, based on the records from these banks, from December 2010 through August 31, 2018 (which are the last bank statements obtained), the total amount of money transferred from Company S to Company D, less any monies from Company D back to Company S, was approximately $344,027,000.  In comparison, all of the other deposits into Company D accounts were only approximately $23,462,000 (excluding monies from personal accounts belonging to Individuals 1 and 2 or an E*TRADE account).  Taking a conservative approach that assumes all of this $23,462,000 is lease revenue (which, as discussed next, does not appear accurate based on the evidence in this investigation), 93.6% of the monies deposited into Company D's accounts has come from Company S.

173.    A few entities that were not identified in the Company documents were also included as potential lessors in the analysis.  These included FB Credit Finance, F Investors, and S Holdings.

174.    Further, a review of the Company D accounts from First Republic Bank through CTBC show that, in comparison to the amount of lease money that Company D has claimed to have received

from third-party leases, relatively small amounts have actually come from those sources.  In particular, using a conservative approach, at most, $14,525,000 is arguably lease revenue based on a review of the bank records.  I note, however, that approximately $5,158,000 of this total comes from three entities that received over $115,000,000 from Company S and/or Company D.  In my training and experience, and based on the information obtained in this investigation, it appears the Company was funding the payments from these three entities back to Company D as lease payments.

175.    An exception to the pattern of money from Company S to Company D and then to the investment funds is for SE Fund IX, at JPMC.  As noted, the account for SE Fund IX was not opened by Individuals 1 and 2 and was not one that was moved from First Republic Bank through H Bank.  Thus, it does not appear that Individuals 1 and 2 or the Company has access to SE Fund IX in the same way as the other funds.  SE Fund IX also appears unique in so far as, based on the bank account records, SE Fund IX does not receive lease payments from Company D but instead receives payments directly from two entities, A Rentals and Company K, that, based on the documents provided by Person 1, are purported to be leasing MSGs from the Company.  However, a review of the bank records from Company S shows that the Company provides substantial, regular payments to A Rentals and Company K.  Based on this evidence, and the pattern stated above, there is probable cause to believe that S Company pays money to A Rentals and Company K for those entities to then pay SE Fund IX as purported lease revenue, thus concealing the fact that those entities are not, in fact, leasing all of the MSGs ascribed to them by the Company as part of that fund's transaction.

176.    I also reviewed Company bank records with respect to Raceway Corp., which, as discussed above, was purported to have leased 500 MSGs from the Company in relation to a transaction involving ST Bank by which ST Bank would be repaid its $75,000,000 investment through lease revenue from MSGs deployed at Race Company racetracks.  According to bank records, ST Bank has been paid $15,000,000 from the Company.  However, the racetracks have only paid the Company $5,136,000 over this same time period.  Thus, over $9,000,000 paid to ST Bank are not from Raceway Corp. and its racetracks but are from other investors' money.  Furthermore, I note that the Company has paid to Raceway Corp. and its racetracks no less than $10,500,000 during this same time period.  Based on my training and experience, and the pattern stated above, there is probable cause to believe that the

Company funded a portion of the lease payments purportedly from Raceway Corp. that have been used to pay ST Bank.

177.    The information obtained from a review of the bank records demonstrating the flow of money from Company S to Company D and then to the investment funds is consistent with the money flow as stated by S.Z. as well as by Former Employees 1 and 2.  Similarly, the absence of lease revenue from third parties to Company D revealed through a review of the bank records is consistent with that stated by Former Employees 1, 2, and 4.

      6.     **Surveillance shows existence of MSGs at the Company headquarters in Benicia and at US Tower near Visalia, California**

178.    I along with others involved in the investigation have driven by the Company's headquarters located at 4901 Park Road, in Benicia, in California, multiple times.  I have observed over a dozen MSGs parked behind and to the side of the Company headquarters.

179.    Additionally, I requested aerial surveillance of US Tower stated by Former Employee 4 as a location where several hundred MSGs were located.  On October 26, 2018, FBI agents conducted aerial surveillance of US Tower.  The photographs appear to depict several hundred MSGs parked in rows at an outdoor storage yard at the location.  I also note that there are additional trailers that do not appear to have any solar panels parked at the location.  The photographs also showed several warehouse or storage structures at the US Tower complex.

      7.     **Other Information Demonstrating Fraud**

180.    I also received information about someone who contacted the FBI tip line in August 2018 to report that Individual 3 may be involved in potential bribery in Antioch, California, and other suspect business practices, including in relation to the solar business industry where Individual 3 claimed to have made multiple millions of dollars.  The complainant inquired of Individual 3, whom the complainant had known as a co-resident of Antioch, about the source of his wealth and Individual 3 responded that he worked for Individual 1, who operates a solar-credit business that received government funding.  Individual 3 told the complainant that Individual 1 had made over $500,000,000 in his business.  Individual 3 stated that he accompanied Individual 1 on a trip to provide protection.

181.    Thereafter, the complainant was interviewed by an FBI agent at the FBI's office in

Concord, California, in September 2018.  The complainant stated, among other things, that he/she believed that Individual 3 was involved in fraud and possible bribery.  Individual 3 told the complainant that he was involved with a solar energy company called Company S that is owned by Individuals 1 and 2.  Individual 3 admitted to the complainant that Company s is a scam to obtain federal funds for alternative energy initiatives as well as money from investors.  The complainant noticed that after 2013, Individual 3 began to display signs of affluence.

182.   Based on a review of bank records, I saw Individual 1 sent to Individual 3, both individually and through Individual 3's company EE Distribution, a total of $6,645,000 dollars.  Furthermore, in an IRS document provided by Former Employee 1, Individual 3 was identified as a co-owner of SMS, Inc., along with individual 1 in connection with one of the early investment funds.

### 8.   Use of Wires and Submission of Tax Returns

183.   The FBI forensic accountant has reviewed the bank records for the investment funds that identify wire transfers processed through the Federal Reserve Banks's FedWire Fund Services.  I know from public records and my training and experience the FedWire is used to transfer funds between banks.  The bank records demonstrate that investors executed wire transfers to the investment fund bank accounts in connection with the tax-equity investment deals that are part of the fraud scheme.  In my training and experience, I know that wire transmissions that are processed through FedWire's services are routed through FedWire's facility in New Jersey.  Therefore, there is probable cause to believe the fraud scheme involved the use of interstate wire transmissions.

184.   I am also aware through information obtained through the IRS that various of the investment funds submitted tax returns that sought alternative energy tax credits for the investors as well as depreciation in connection with the MSGs purchased through the scheme.  As such, there is probable cause to believe that Individual 1 and others committed the overt acts as discussed above in connection with the preparation of false tax returns.

### C.   Evidence that Individuals 1 and 2 Have Engaged in Monetary Transactions Involving Criminally Derived Funds

185.   According to Former Employee 2, Individuals 1 and 2 used money from the Company S account to purchase several properties as well as between 30 and 100 cars.  Former Employee 2 said that

Individual 1 would have the cars delivered to the Company's headquarters and then transported by car carrier down the road to a large warehouse structure with the addresses 471, 473, and 475 East Channel Road, in Benicia, in California.

186.    An FBI forensic accountant and an FBI forfeiture investigator have reviewed bank records, records from title companies, and public records.  Based on a review of these records, they have identified dozens of properties that Individuals 1 and 2 purchased after 2011 for a total of $40,778,779.57.  Most of those purchases were in the name of various LLC's—*e.g.*, Dog Blue, Dora Dog, Brandy Boys, and Fou Dog—associated with Individuals 1 and 2 based on bank and title company records as well as witness statements.

187.    At least five of the real property transactions by Individuals 1 and 2 involved the purchase of property in the Eastern District of California, including two in 2015, one in 2016, and two in 2017.  Based on a review of bank and title records, it appears that Individuals 1 and 2 caused monetary transfers in excess of $10,000 from bank accounts held at H Bank in connection with at least three of these purchases.  (Additional title company records for the remaining two properties have been requested but not yet received or reviewed.)  H Bank was FDIC insured.  The money that was used for these purchases was derived, in whole or in part, from money transferred from the Company S accounts to various of the personal accounts held by individuals 1 and 2.

188.    A review of bank records as well as vehicle registrations at the California Department of Motor Vehicles, identified at least 90 vehicles, including luxury cars, and pickup trucks for the Company, that have been purchased by and are registered to Individuals 1 and 2 and/or the Company.  Collectively, the amount of money used to purchase vehicles traceable to the Company is at least $3,448,515.  The FBI forfeiture investigator identified numerous vehicle purchases each of which were in excess of $10,000.

189.    Further, as discussed below, bank records also show that Individuals 1 and 2, using money from the Company, have paid approximately $19,000,000 to a private jet service.

190.    Additionally, as stated above, Former Employees 1 and 2 stated that the Company's primary source of revenue was from investor funds.  This is consistent with an FBI forensic accountant's review of the bank records.  In particular, after accounting for (1) the payments from investment funds

to S Company on the promissory notes that, as stated above, are based on the circular flow of money from investors to Company S to Company D to investment funds; (2) the roll-overs from accounts at predecessor banks; (3) transfers from Company D; and (4) a deposit from an entity (PB Entity) that had received a larger amount of money from Company S, no less than approximately 94% of the deposits into the Company S accounts were from investors or financial institutions in connection with the purchase of MSGs.  This number is conservative insofar as it includes deposits into the Company S accounts from personal accounts of Individuals 1 and 2 or LLC accounts, as well as individuals or entities that received money from the Company or Individuals 1 and 2.  Thus, the amount of deposits into the Company's accounts as a result of the investment and tax fraud scheme may be higher than 94% of the total.

191.    As set forth above, there is probable cause to believe that the investor funds paid to the Company are the result of an investment and tax fraud scheme and that Individuals 1 and 2 have committed wire fraud in connection with the scheme.  Accordingly, there is probable cause to believe that Individuals 1 and 2, in connection with the purchase of real property and vehicles, have engaged in monetary transactions involving criminally derived funds.

## IV.    ASSETS TRACED TO CRIMINALLY DERIVED FUNDS

### A.    Individuals 1 and 2 Maintain Dozens of Bank Accounts Containing Funds Directly Traceable to the Scheme, Commingled Scheme Funds, and Funds Generated From Property Purchased with Criminally Derived Funds.

192.    As explained above, I along with an FBI forensic accountant and an FBI forfeiture investigator have reviewed bank records showing the movement of funds from S Company to bank accounts maintained and controlled by Individuals 1 and 2, and their adult children. These include various accounts associated with the Company, including investment funds accounts.  Additionally, tracing the scheme's proceeds resulted in the further identification of bank accounts used by the Individuals 1 and 2 to commingle scheme funds with other money, including funds generated from the assets purchased with funds traced back to the Company.  The bank accounts are typically named after the LLCs used by Individuals 1 and 2 to purchase multiple parcels of real estate (*e.g.*, Dog Blue or Dora Dog), after the address of a specific property acquired by Individuals 1 and 2 (*e.g.*, 140 Mason Circle), or after a business associated with them (*e.g.*, the Martinez Clippers minor league baseball team).

Additionally, as with the investment fund accounts described above, many of these personal or LLC accounts were opened by Individuals 1 and 2 and then moved to successor banks, the last being CTBC. In each instance, Individuals 1 and 2 created the LLCs in order to hold assets acquired using funds from the Company.

### 1.    The "Dog" and "Boy" Entity Bank Accounts

193.    Based on bank records, title records, and/or witness statements, Dora Dog Properties, Dog Blue Properties, Brandy Boy Properties, and Fou Dog Properties are entities that Individuals 1 and 2 appear to have created to own or manage real estate purchased with proceeds they derived from the Company.  The LLCs collectively own at least 26 properties and Individuals 1 and 2 maintain separate bank accounts for each entity.

194.    Based on bank and public records, Dora Dog Properties, LLC, co-managed by Individuals 1 and 2, was created in 2013.  Using funds traced back to the Company, Dora Dog has acquired at least twelve properties, five in Martinez, California, five in El Sobrante, California, and one each in Las Vegas, Nevada, and Lafayette, California.  Bank records show that from April 12, 2018 to August 31, 2018, tens of thousands of dollars were transferred to Dora Dog's bank account from Company S, accounting for 72% of all deposited funds in the account.  The account also has received what appears to be rental income generated from these properties that were purchased from criminally-derived proceeds.

195.    Based on bank and public records, Dog Blue Properties, LLC, also co-managed by Individuals 1 and 2, was created in 2012.  Using funds traced back to the Company, Dog Blue has acquired at least eight properties, five in Martinez and one each in Walnut Creek, South Lake Tahoe, and Las Vegas.  Bank records show that thousands of dollars are routinely transferred to Dog Blue's bank account from Company S, including 100% of all deposited funds in August 2018.  The account also has received what appears to be rental income generated from these properties that were purchased from criminally derived proceeds.

196.    Based on bank and public records, Brandy Boy Properties, LLC was created in 2015 and Individuals 1 and 2 are co-managers.  Using funds traced back to the Company, Brandy Boy has acquired at least five properties, three in South Lake Tahoe and one each in Scottsdale, Arizona and

Round Rock, Texas.  Bank records show that thousands of dollars are routinely transferred to Brandy

Boy's bank account from Company S, including 89% of all deposited funds from June 27, 2018 to

August 31, 2018.  The account also has received what appears to be rental income generated from these

properties that were purchased from criminally derived proceeds.

197.    Based on bank and public records, Fou Dog Properties, LLC was created in 2016 by

Individuals 1 and 2.  Using funds traced back to the Company, Fou Dog has acquired property in

Benicia, California.  Bank records show that thousands of dollars are routinely transferred to Fou Dog

bank account from Company S, including 98% of all deposited funds from October 26, 2017 to August

31, 2018.

### 2.    **The Single Property LLC Bank Accounts**

198.    Based on bank and public records, starting in 2015, Individuals 1 and 2 created a series of

entities to hold individual parcels of real estate—named after the address or street of the acquired

property.  As explained above, Individuals 1 and 2 maintain separate bank accounts at CTBC for each

entity.  For example:

a.)    Individuals 1 and 2 formed 2750 Maxwell Way, LLC to acquire 2750 Maxwell

Way in Fairfield, California.  The sales price was nearly $2.4 million.  Individuals 1 and 2 transferred

funds from Company S for the purchase, first via a $100,000 transfer to an escrow account, then a

second transfer of $2,287,335.34 to payoff the loan.  In total, bank records show $2,387,335.34 was

transferred from Company S to purchase 2750 Maxwell Way.  The LLC has a bank account at CTBC—

named "2750 Maxwell Way"— and Bank records show that thousands of dollars are routinely

transferred to the account from Company S, including 96% of all deposited funds from July 12, 2018 to

August 31, 2018.

b.)    In December 2017, Individuals 1 and 2 created 4021 Pike Lane, LLC to acquire

4021 Pike Lane in Concord, California.  The sales price was over $2 million.  Funds from Company S

were used to purchase the property, first via a $100,000 transfer to the property's escrow account, then a

second transfer of $1,991,458.54 to payoff the loan.  In total, bank records show $2,091,458.54 was

transferred from Company S to purchase 4021 Pike Lane.  The LLC has a bank account at CTBC—

named "4021 Pike Lane"—and Individuals 1 and 2 are the only authorized signors.  The account also

has received what appears to be rental income generated from these properties that were purchased from criminally derived proceeds.

        c.)    In 2015, Individuals 1 and 2 created 140 Mason Circle, LLC to acquire property at that address in Concord, California.  Individuals 1 and 2 used money from Company S for the purchase, totaling over $1.65 million.  The LLC has a bank account at CTBC—named "140 Mason Circle"—and has received what appears to be rental income generated from these properties that were purchased from criminally derived proceeds.

        d.)    California Secretary of State records show that Individuals 1 and 2 are managers of an entity named Antioch Mini Storage, LLC.  In 2015, this entity purchased a rental storage property located at 815 Sunset Avenue, in Antioch, for over $3 million.  Bank records show Individuals 1 and 2 purchased the property using funds traced back to Dora Dog Properties—funds in this account are traceable back to the Company.  The LLC has a bank account at CTBC—named "Antioch Mini Storage"— and has received what appears to be rental income generated from these properties that were purchased from criminally derived proceeds.

        e.)    In 2015, Individuals 1 and 2 created Park Road LLC to acquire property at 4901 Park Road, in Benicia, California.  Individuals 1 and 2 used $3.5 million from Company S for the purchase.  The LLC has a bank account at CTBC—named "Park Road LLC"—and Individuals 1 and 2 are the only authorized signors.  Bank records show that thousands of dollars are routinely transferred to Park Road LLC's bank account from Company S, including 62% of all deposited funds from March 30, 2018 to August 31, 2018.

### 3.   **The Business Bank Accounts**

199.   Based on bank records, Individuals 1 and 2 also maintain bank accounts for their various businesses and routinely transfer thousands of dollars to those accounts from Company bank accounts.  For example:

        a.)    Martinez Clippers minor league baseball team; approximately 93% of all funds deposited (*since creation*).

        b.)    Go Green Studio Rentals, Inc.; approximately 81% of all funds deposited (*January 30, 2018 to August 31, 2018*).

c.)     Headways Hair & Day Spa, Inc.; approximately 100% of all funds deposited (*February 7, 2018 to August 31, 2018*).

d.)     Bay Area Screenprint, Inc.; approximately 65% of all funds deposited (*January 30, 2018 to August 31, 2018*).

e.)     CDRL Nutritional; approximately 52% of all funds deposited (*since creation*).

f.)     475 Channel Road; approximately 85% of all funds deposited (*October 26, 2017 to August 31, 2018*)

200.   Individuals 1 and 2 also maintain personal and investment accounts that have received, and/or continue to receive, large transfers from the Company bank accounts.  For example:

a.)     Individuals 1 and 2, personal account at CTBC, ending in 6840 ("CTBC 6840"); approximately 66% of all funds deposited.

b.)     Company S MFG, Bank of America, account ending in 1020 ("BofA 1020"); approximately 94% of all funds deposited.

c.)     Individuals 1 and 2, personal account at JP Morgan Chase, ending in 1273 ("JPMC 2732"); approximately 83% of all funds deposited.

d.)     Company D, investment account at E*TRADE, ending in 3631 ("Etrade 3631"); $10 million deposited from Company D, later withdrawn and the trading gains remain in the account.

201.   Below is a chart that identifies, by bank and account number, each account associated or affiliated with Individuals 1 and 2 or the Company to which criminally derived proceeds have been traced as of August 31, 2018 or later in addition to those discussed above:

| | Institution and Account Number (Last four) | Account Name | Signatories |
|---|---|---|---|
| 1 | CTBC 2542 | Dora Dog Properties, LLC | Individuals 1 and 2 & children |
| 2 | CTBC 2559 | Dog Blue Properties, LLC | Individuals 1 and 2 & children |
| 3 | CTBC 2732 | Brandy Boy Properties, LLC | Individuals 1 and 2 & children |

| 4 | CTBC 2567 | Fou Dog Properties, LLC | Individuals 1 and 2 & children |
| 5 | CTBC 4062 | 2750 Maxwell Way, LLC | Children of Individuals 1 and 2 |
| 6 | CTBC 5112 | 4021 Pike Lane, LLC | Individuals 1 and 2 |
| 7 | CTBC 2757 | 140 Mason Circle, LLC | Individuals 1 and 2 & children |
| 8 | CTBC 2534 | Antioch Mini Storage, LLC | Individuals 1 and 2 & children |
| 9 | CTBC 2795 | Park Road LLC | Individuals 1 and 2 |
| 10 | CTBC 2773 | 475 Channel Road | Individuals 1 and 2 & children |
| 11 | CTBC 7688 | Martinez Clippers Baseball Association | Individuals 1 and 2 & children |
| 12 | CTBC 1965 | Go Green Studio Rentals, Inc. | Individuals 1 and 2 & children |
| 13 | CTBC 2575 | Headways Hair & Day Spa, Inc. | Individuals 1 and 2 & children |
| 14 | CTBC 2781 | Bay Area Screenprint, Inc. | Individuals 1 and 2 & children |
| 15 | CTBC 0006 | CDRL Nutritional | Individuals 1 and 2 & children |
| 16 | CTBC 6840 | Individuals 1 and 2 | Individuals 1 and 2 |
| 17 | BofA 1020 | S Company MFG | Individuals 1 and 2 & children |
| 18 | JPMC 2373 | Individuals 1 and 2 | Individuals 1 and 2 & children |
| 19 | Etrade3631 | D Company | Individuals 1 and 2 |

### B. Individuals 1 and 2 Purchased at least 90 Vehicles with Funds Directly Traceable to the Scheme or Funds Generated From Property Purchased with Criminally Derived Funds.

202.    An FBI forfeiture investigator has analyzed bank and DMV records to identify at least ninety vehicles purchased using funds traced back to the Company or one of the investment funds.  Bank records show that Individuals 1 and 2 purchased several of these vehicles via direct transfers from Company S bank accounts.  Most of the vehicles, however, were acquired by moving the funds from Company S or an investment fund account to an intermediary account and then to the seller's bank account via a wire, check or bank transfer.  Individuals 1 and 2 would purchase a single vehicle, or groups of vehicles in the same transaction, from individuals, dealerships, and classic car auctioneers. Below are several examples of vehicles purchased criminally derived funds by Individuals 1 and 2 each year between 2011 and 2018.

#### 2011

203.    Bank and vehicle records show that in April 2011 Individuals 1 and 2 purchased a 2007 Dodge Ram from a Dodge Dealership for $9,954.21.  Individuals 1 and 2 purchased the Dodge Ram using funds pulled directly from Company S's account at Fremont Bank.

#### 2012

204.    Bank and vehicle records show that in December 2012 Individuals 1 and 2 purchased a 2012 Jaguar XKR from a European Car Dealership for $98,681.85.  Individuals 1 and 2 purchased the vehicle with funds drawn from their personal bank account at Fremont Bank.  The FBI has traced those funds back to Company S's account at Fremont Bank.

#### 2013

205.    Bank and vehicle records show that in July 2013 Individuals 1 and 2 purchased a 2011 BMW 328i from a BMW Dealership for $26,397.62.  Individuals 1 and 2 purchased the vehicle for their son with a check drawn from a personal bank account.  The FBI has traced those funds back to Company S's account at Fremont Bank.

#### 2014

206.    Bank and vehicle records show that in May 2014 Individuals 1 and 2 purchased a 2014 Jaguar XK from a European Car Dealership for $195,520.63.  Individuals 1 and 2 purchased the vehicle

with funds drawn from their personal bank account at Fremont Bank.  The FBI has traced those funds back to Company S's account at Fremont Bank.

207.    Bank and vehicle records show that in September 2014 Individuals 1 and 2 purchased a 1969 Plymouth Road Runner from a classic car auctioneer for $325,800.00.  Individuals 1 and 2 purchased the vehicle with funds drawn from their personal bank account at Fremont Bank.  The FBI has traced those funds back to Company S's account at Fremont Bank.

208.    Bank and vehicle records show that in October 2014 Individuals 1 and 2 purchased two Dodge Rams (2014 & 2105 model years) for $106,407.11.  Individuals 1 and 2 purchase the vehicles in a cumulative transaction from a classic car auctioneer.  Individuals 1 and 2 purchased the vehicle with funds drawn from the Company S's account at Fremont Bank.

**2015**

209.    Bank and vehicle records show that in 2015 Individuals 1 and 2 purchased seven classic cars from an auctioneer using funds from Company S.  In total, the cars cost hundreds of thousands of dollars: (1) 1972 Chevrolet Cheyenne PU, (2) 1982 Chevrolet Camaro Z28, (3) 1964 Austin Healey, (4) 1964 Pontiac GTO, (5) 1968 Plymouth GTX, (6) 1971 Dodge Super Bee, and (7) 1970 Plymouth Satellite Belvedere.

**2016**

210.    Bank and vehicle records show that in 2016 Individuals 1 and 2 purchased six classic cars from an auctioneer using funds from Company S.  In total, the cars cost over $600,000: (1) 1970 Plymouth AAR 'Cuda, (2) 1967 Chrysler 300 Convertible, (3) 1993 AM General Military, (4) 1971 Chevrolet Camaro Z28, (5) 1991 AM General M998, and (6) 1948 Chevrolet Panel Van.

**2017**

211.    In 2017, Individuals 1 and 2 purchased a series of luxury cars for over $1.6 million, including a Ford Mustang GT 500 Super Snake for $1,000,000.00, a 1930 Cord L29 Brougham for $300,000.00, and two Bentleys for $372,008.82.  Bank and vehicle records show these purchases were made using funds from Company S.

212.    Separately in 2017, bank and vehicle records show that Individuals 1 and 2 purchased thirteen classic cars from an auctioneer using funds from Company S.  In total, the cars cost over $1.5

million: (1) 1965 Fiat 600, (2) 1970 Plymouth AAR 'Cuda, (3) 1970 Plymouth Superbird, (4) 1961 Volkswagen Beetle, (5) 1969 Dodge Charger 500, (6) 1969 Chevrolet Copo Camaro, (7) 1967 Dodge Dart, (8) 1966 Chevrolet Chevelle, (9) 1932 Ford Roadster, (10) 1970 Dodge Challenger, (11) 1968 Chevrolet Camaro, (12) 1981 Pontiac Trans Am, and (13) 1978 Pontiac Trans Am.

## **2018**

213.     In 2018, Individuals 1 and 2 purchased a series of luxury cars, including a 2018 Dodge Challenger SRT Demon for $105,682.01, 2017 Cadillac CTS-V for $95,105.31, and 1967 Ford Mustang GT 500 Super Snake for $192,550.00.  Bank and vehicle records show these purchases were made using funds from Company S.  Bank and vehicle records also show that in January 2018 Individuals 1 and 2 made two bulk purchases using funds from Company S—buying ten 2018 Dodge Rams for $589,613.27 and three Chevy Volts for $189,905.00.

214.     Bank records also show that Individuals 1 and 2 have purchased two boats and one motorhome using funds from Company S.  In 2015, Individuals 1 and 2 purchased a Chriscraft boat for $58,000 using funds transferred from Company S's account at H Bank.  Individuals 1 and 2 subsequently purchased a $125,000 Prevost Outlaw Motorhome and a $100,000 Bennington Pontoon boat using funds from Company S's accounts at H Bank and China Bank & Trust.

I swear under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to my information and belief.

Date: _____2/8/19_____                         /s/ Christopher Phillips_____
                                                CHRISTOPHER PHILLIPS
                                                Special Agent
                                                Federal Bureau of Investigation

                                                (Signature retained by attorney)